EL PUEBLO DE PUERTO RICO, apelado, *v.* MARTÍN RAMOS DELGADO y JOSÉ J. ÁLVAREZ, acusados y apelantes.

*Número:* CR-84-18     *Resuelto:* 30 de junio de 1988

*Carmen Ana Rodríguez Maldonado, Antonio Colón Montes* y *Margarita Carrillo*, de la *División de Apelaciones* de la *Sociedad para Asistencia Legal*, y *Federico Rentas Rodríguez*, de la *Facultad de Derecho de la Universidad Interamericana*, abogados de los apelantes; *Rafael Ortiz Carrión, Procurador General*, y *Lorenzo Vilanova Alfonso, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

El 25 de febrero de 1984 se celebró el juicio por jurado en el que los acusados José Javier Álvarez y Martín Ramos Delgado fueron encontrados culpables de diversos cargos. Martín Ramos Delgado fue sentenciado a cumplir penas de quince (15) años en cada uno de los casos por infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418 (8 cargos), para un total de cincuenta y cuatro (54) años de prisión. Las penas fueron dictadas para cumplirse concurrentemente.

José Javier Álvarez fue sentenciado a quince (15) años de prisión por tres (3) cargos relacionados con el delito de robo y a tres (3) años de reclusión por infracciones al Art. 6 de la Ley de Armas de Puerto Rico, *supra*. Se dispuso que las sentencias se cumplirían concurrentemente. No conformes con el veredicto de culpabilidad, los acusados de epígrafe apelaron ante nos.

Luego de varios incidentes referentes a la representación legal de los apelantes, consolidamos ambas apelaciones.

I

*Los hechos*

El 4 de mayo de 1983 la sucursal del Royal Bank of Canada, ubicada en la Parada 20 de Santurce, fue objeto de un asalto. En el mismo participaron dos (2) personas. Una de ellas entró a la sucursal y exigió a los cajeros que le entregaran el dinero que había en las gavetas. La otra permaneció en la entrada del banco en un pasillo con salida hacia la calle.

El 27 de junio la referida sucursal fue asaltada nuevamente. Otra vez participaron dos (2) personas. Posteriormente, el 12 de julio, fue asaltada la sucursal del Scotiabank de la Parada 18 en Santurce. En esta ocasión, una persona vestida con *sweater*, mahón, utilizando gafas oscuras y un

casco protector de la cabeza usado por motociclistas entró al banco y ordenó a los cajeros que le entregaran el dinero que tenían a mano. Hasta este tercer asalto, la Policía no tenía sospechas de quiénes habían perpetuado los mismos.

El 13 de julio de 1983, un día después del tercer asalto, el joven Juan Delgado De Jesús y otras dos (2) personas se encontraban en horas de la madrugada dentro de un plantel escolar cerca del residencial público Las Margaritas. La Policía, al percatarse de la presencia de un automóvil abierto en el estacionamiento de la escuela, comenzó a inspeccionarlo. Los jóvenes se dirigieron hasta donde estaba la Policía y, al no poder ofrecer una explicación satisfactoria de lo que hacían en el interior de la escuela, fueron arrestados y trasladados al Cuartel de la Policía de Barrio Obrero. Allí la Policía le ordenó a Juan Delgado De Jesús que sacara todo lo que tenía en los bolsillos de su vestimenta. Entre las pertenencias había una peinilla, las llaves del carro en que transitaba, las llaves de su casa y $469 en efectivo. Los policías le preguntaron sobre la procedencia del dinero y éste dio varias versiones, entre ellas, señaló que el dinero era de él, que era de su hermano, que era de su abuela y, finalmente, que se lo había robado a otra persona. Luego de haber sido interrogado, Juan Delgado De Jesús confesó que los $469 eran parte del dinero que se había robado en el asalto al Scotiabank de la Parada 18 de Santurce efectuado el día anterior. Los otros dos (2) jóvenes arrestados fueron puestos en libertad.

Juan Delgado De Jesús confesó que fue copartícipe en los asaltos de 4 de mayo y de 27 de junio de 1983, efectuados en la sucursal del Royal Bank of Canada de la Parada 20 en Santurce. Confesó que en esos dos (2) asaltos participaron Martín Ramos Delgado (primo de Juan Delgado De Jesús), José Javier Álvarez Vargas, Wanda Ramos (hermana de Martín Ramos) y un menor de nombre Manuel. Manifestó, además, que había participado junto a José Javier Álvarez

en el asalto al Scotiabank de 12 de julio, pero que en dicho asalto no había participado Martín Ramos.

Como resultado de esa confesión extrajudicial, se procedió a arrestar, mediante orden judicial, y a fichar a todos los implicados. El 22 de julio de 1983 Martín Ramos fue arrestado y llevado al Cuartel de la Policía de Hato Rey. El sargento Cortés lo entrevistó y le informó que tenía que dialogar con él en relación con unos robos de banco. El policía le hizo las advertencias legales correspondientes y le preguntó si quería declarar. Martín declaró que había participado en los robos de la sucursal del Royal Bank of Canada. Al momento de emitir esta declaración, sólo estaban presentes Martín Ramos y el sargento Cortés.

Del cuartel de Hato Rey, Martín Ramos fue trasladado al Centro Judicial de San Juan. Allí el fiscal Julio Soto lo entrevistó y, luego de hacerle las advertencias legales, lo sometió a un interrogatorio en presencia de su señora madre. La declaración fue transcrita a maquinilla y firmada por él. Su señora madre firmó como testigo. En la declaración escrita, Martín Ramos manifestó que había participado en dos (2) asaltos al Royal Bank: uno (1) el 4 de mayo y otro el 27 de junio de 1983. Expresó que en las dos (2) ocasiones asaltó el banco en compañía de Juan Delgado De Jesús y que ellos habían utilizado una pistola, así como un revólver de cañón corto.

Las autoridades del orden público, fundándose en las confesiones extrajudiciales de Juan Delgado De Jesús y de Martín Ramos, presentaron cargos contra ellos, así como contra José Javier Álvarez. Martín Ramos y José Javier Álvarez fueron juzgados conjuntamente y declarados culpables por el Jurado que consideró el caso.

El copartícipe Juan Delgado De Jesús no fue procesado, ya que se le otorgó inmunidad total a cambio de que declarara en el juicio contra los otros copartícipes.

*Los errores señalados*

El apelante Martín Ramos alega ante nos la comisión de los errores siguientes:

1. Erró el tribunal al denegar la solicitud de la defensa para que se hiciera una determinación preliminar sobre la admisibilidad del testimonio del coacusado Juan Delgado De Jesús y al denegar la supresión de la declaración judicial de este testigo.

2. Erró el tribunal al admitir en evidencia la confesión del apelante Martín Ramos Delgado, ya que ésta no había sido voluntaria.

3. Erró el tribunal al declarar sin lugar una moción de supresión de identificación extrajudicial.

Por su parte, el apelante José Javier Álvarez señala los errores siguientes:

1. Erró el tribunal de instancia al denegar una solicitud de la defensa para suprimir la confesión extrajudicial y la declaración judicial del coautor Juan Delgado De Jesús.

2. Cometieron grave error los miembros del Jurado al declarar culpable al apelante a base de una prueba de cargo contradictoria que no rebatió la presunción de inocencia ni estableció la culpabilidad del acusado más allá de toda duda razonable.

## II

El primer error alegado por ambos apelantes es similar, por tal razón lo discutiremos en forma conjunta. El mismo se refiere a la voluntariedad de la confesión extrajudicial y judicial de Juan Delgado De Jesús, la cual dio fundamento al arresto y posterior confesión de Martín Ramos.

El planteamiento es medular para determinar qué efecto, si alguno, tuvo sobre el arresto, la confesión y el procesamiento de Martín Ramos y de José Javier Álvarez. Además, debemos determinar el efecto que tuvo la confesión judicial

subsiguiente de Juan Delgado De Jesús sobre los derechos de los apelantes.

*Sobre la voluntariedad de la confesión extrajudicial de Juan Delgado De Jesús*

Concluimos que la confesión extrajudicial de Juan Delgado De Jesús fue voluntaria y que, de no haberlo sido, su confesión judicial, que también fue voluntaria, salvó cualquier vicio de la confesión extrajudicial.

Antes de que comenzara el desfile de la prueba por parte del Ministerio Público, la defensa de los apelantes solicitó que se suprimiera la confesión prestada por el testigo Juan Delgado De Jesús. La defensa solicitó, en adición, que no se permitiera que este testigo declarase en el juicio debido a que entendía que su confesión extrajudicial no había sido voluntaria, sino que por el contrario, había sido producto de la agresión física utilizada por parte de los policías en el testigo.

Señaló, además, que la declaración en el acto del juicio tampoco era voluntaria, pues el testigo temía por su vida. La defensa argumentó que la confesión del testigo era "fruto del árbol prohibido" y que tal testimonio no podía utilizarse en contra del acusado, aun cuando se tratase de establecer que el testigo declaraba voluntariamente en el juicio. Este planteamiento fue declarado sin lugar por el tribunal de instancia.

Al momento de declarar en el juicio, al testigo Juan Delgado De Jesús se le había ofrecido una reducción en la clasificación del delito a cambio de su declaración. Se le había ofrecido acusarlo por tentativa de robo en vez del delito de robo. Luego de que el Ministerio Público finalizara el interrogatorio directo del testigo, éste se negó a continuar declarando hasta tanto le garantizaran inmunidad total. Ante este reclamo, el Ministerio Público le brindó la misma. Tanto en el interrogatorio directo como en el contrainterrogatorio, el

testigo señaló que había sido llevado al Cuartel de la Policía de Barrio Obrero y que allí había sido golpeado por varios oficiales del orden público. Luego de ello, confesó la ocurrencia del robo a los bancos y firmó una confesión en la que incriminaba a los aquí apelantes. A base del relato antes mencionado, la defensa solicitó la supresión de la confesión extrajudicial y el testimonio brindado en corte por el testigo.

Si bien la confesión extrajudicial de Juan Delgado De Jesús no fue utilizada durante el proceso judicial que se siguió contra los apelantes, el tribunal de instancia pasó juicio sobre la voluntariedad de la misma. Los apelantes argumentan que el tribunal de instancia declaró sin lugar la moción de supresión a pesar de que el propio tribunal había resuelto que al referido testigo se le habían violado sus derechos constitucionales durante el transcurso del interrogatorio que produjo su confesión extrajudicial. No les asiste la razón.

Al resolver la moción de supresión de testimonio, el tribunal expresó:

> *Asumiendo* la certeza del testimonio de Juan Delgado podríamos determinar que las admisiones que le hiciera el testigo a los agentes que lo arrestaron y lo interrogaron en el [C]uartel de Barrio Obrero en Santurce, fue obtenida mediante amenazas y otros medios ilegales y siendo así[,] obviamente, dichas admisiones incriminatorias no podrían utilizarse contra el declarante, sencillamente están teñidas de ilegalidad por habérsele violado sus derechos constitucionales . . . . (Énfasis suplido.)

Estas expresiones, en las cuales descansan los apelantes para sustentar su apreciación, obviamente no establecen que la confesión extrajudicial de Juan Delgado De Jesús hubiese sido hecha bajo coacción. Las mismas sólo indican las consecuencias que ello conllevaría en el supuesto de que hubiese existido dicha coacción.

Una evaluación cuidadosa de la prueba presentada en autos refleja que *no existe fundamento para alterar la apre-*

*ciación del tribunal de instancia en el sentido de que la con-*
*fesión extrajudicial de Juan Delgado De Jesús había sido*
*voluntaria.* Veamos.

El testigo Juan Delgado De Jesús no le informó al sar-
gento Cortés ni al fiscal Meléndez de los actos de agresión a
los que fue expuesto, alegadamente, en el cuartel de Barrio
Obrero. T.E. II, pág. 102; T.E. III, pág. 50; T.E. VI, pág. 380.
El testigo declaró posteriormente ante la Juez Olga Birriel
durante la vista de determinación de causa probable para
arresto y tampoco le *informó* sobre las supuestas agresiones
de que fue víctima. T.E. VI, pág. 380.

Por otra parte, luego de que el testigo ingresó a prisión,
fue examinado por el doctor Díaz Rivera. En ese momento
Delgado De Jesús se quejó solamente de fatiga y congestión
nasal. Éste atestó en el juicio que no le había relatado a dicho
médico los hechos relacionados con la supuesta agresión de
que fuera objeto, por la razón de que ya en ese momento no
sentía el dolor que le habían producido los golpes propinados
por los policías en sus rodillas y costillas y, además, por la
razón de que las supuestas quemaduras que había sufrido en
su cuerpo ya habían desaparecido. T.E. III, págs. 85 y 88;
T.E. IV, págs. 25–27.

Cuando se le confrontó con una aseveración suya de que
el día de ingreso a prisión le había indicado al oficial de cus-
todia Cardona Rivera que se sentía bien de salud, el testigo
contestó no recordar. T.E. III, pág. 83. Tampoco pudo ofre-
cer una contestación satisfactoria cuando se le pidió que
mostrara las quemaduras y golpes a que hacía alusión en su
testimonio en una fotografía (*exhibit* I de El Pueblo) que se
le había tomado con posterioridad a la agresión. T.E. IV, pág.
27.

Del testimonio brindado en corte por Juan Delgado De
Jesús se desprende que, después de las alegadas agresiones
por parte de la Policía, éste prestó testimonio al sargento
Cortés y, posteriormente, al Fiscal Obdulio Meléndez, he-

chas las advertencias legales de rigor y sin que éstos le agredieran o le coaccionaran de alguna manera. Como señalamos, el testigo no les comunicó dato alguno sobre las agresiones; tampoco ellos notaron en la persona del testigo maltrato físico alguno o la presencia de un ánimo deprimido. T.E. VI, págs. 414–415. Conforme al propio testimonio de Juan Delgado De Jesús, cuando declaró ante el sargento Cortés y el Fiscal Obdulio Meléndez no estaban presentes ninguno de los policías que alegadamente le habían golpeado.

El Ministerio Público igualmente enfatizó que, durante el siguiente día de la alegada agresión, el testigo no se quejó de haber sido agredido y tampoco demostraba signos de agresión. El testigo, por el contrario, caminaba bien y cooperó activamente con las autoridades policíacas y sus familiares. T.E. IV, págs. 25–27.

Ante la prueba presentada en el juicio, el tribunal de instancia concluyó que al testigo no se le violaron sus derechos constitucionales.

*Sobre la voluntariedad de la confesión judicial del coautor Juan Delgado De Jesús*

Una evaluación cuidadosa de la prueba presentada en autos refleja, de la misma manera, que *tampoco existe fundamento para alterar la apreciación del tribunal de instancia sobre la voluntariedad de la confesión judicial de Juan Delgado De Jesús.*

El apelante, José Javier Álvarez, alegó ante el tribunal de instancia que el debido proceso de ley le garantiza a un acusado el que su convicción no podrá fundarse en una confesión, si la misma fue involuntaria, por haber sido obtenida mediante medios ilegales. *Pueblo v. Santiago Sánchez*, 111 D.P.R. 379 (1981); *Pueblo v. Alcalá Fernández*, 109 D.P.R. 326 (1980); *Pueblo v. Chaar Cacho*, 109 D.P.R. 316 (1980). Alegó, además, que tal norma jurídica es extensiva también a un coautor encontrado convicto con la única declaración de

un testigo cuya confesión inicial se obtuvo mediante métodos ilegales. Los apelantes han reiterado esa misma alegación ante nos.

El ataque de los apelantes va dirigido no sólo a la confesión extrajudicial de Juan Delgado De Jesús, sino también al testimonio prestado en corte por este coautor.

Transcurridos *cinco (5) meses* del supuesto acto de agresión, Delgado De Jesús declaró en el juicio contra el apelante Martín Ramos. En esa ocasión sostuvo que su declaración era de naturaleza voluntaria y libre de coacción. T.E. III, págs. 24–25, 82 y 112; T.E. IV, pág. 34; T.E. VI, págs. 377–381.

A esos efectos, citamos las propias declaraciones vertidas en el juicio por el testigo Juan Delgado De Jesús:

JUEZ : . . . ¿yo le pregunto si usted en este momento se encuentra presionado, obligado por este Tribunal para prestar testimonio?

TESTIGO: No Señor.

JUEZ : El Tribunal le vuelve a repetir que usted puede hacer la decisión que usted quiera hacer, voluntariamente, claro el Tribunal tiene la autoridad en ley para hacer cumplir la ley en la manera que la podamos hacer cumplir; pero usted tiene su voluntad y su decisión de declarar o no declarar. Aquí nadie lo puede obligar a declarar; estamos haciendo los esfuerzos a entender los procedimientos, de manera que usted pueda hacer una decisión razonable dentro del contenido de su intelecto. Pero lo importante para el Tribunal en este momento, es que la decisión suya sea una actitud de voluntad de su parte, que no haya presión, coacción de parte de ninguna persona que lo obligue a usted a prestar testimonio.

TESTIGO: No Señor.

JUEZ : ¿Usted quiere declarar voluntariamente[?]

TESTIGO: Sí Señor.

JUEZ : Bien . . . . Señor usted en el curso de su testimonio, a preguntas del señor fiscal, cuando el fiscal lo interrogó primeramente en el curso de este juicio, usted hizo una relación de unos hechos que ocurrieron en distintas fechas . . . comenzando con el 4 de mayo de 1983 de hechos relacionados a un asalto a un banco; 27 de junio de 1983 hechos relacionados con asalto a otro banco; y el 12 de julio de 1983 en relación a otro asalto a otro banco; el cual usted situó a los dos imputados, hizo relación a un sitio en donde se reunían, en la casa de una joven de nombre Wanda e hizo una serie de relatos en relación con estas tres fechas; el Tribunal le pregunta a usted joven en este momento, primero, ¿si su declaración aquí, aquí en este salón, en este recinto, en el salón de Sesiones de este Tribunal, *si su declaración obedece si usted ha sido coa[c]cionado, violentado, intimidado, empujado, se le ha obligado, a usted prestar esta declaración en este Salón?*

TESTIGO: No Señor[.]

.   .   .   .   .   .   .   .

JUEZ : . . . yo le pregunto si su conducta aquí en el acto del Juicio y su declaración aquí en el Juicio, si ha sido una declaración voluntaria, si usted ha declarado aquí voluntariamente.

TESTIGO: Sí Señor[.]

.   .   .   .   .   .   .   .   .

FISCAL : Su nombre.
TESTIGO: Juan Delgado [D]e Jesús[.]
FISCAL : ¿Cómo se siente esta tarde?
TESTIGO: Bi[e]n.
FISCAL : Una vez usted está protegido por la [i]nmunidad, le pregunto, ¿si está en disposición de continuar declarando?
TESTIGO: Sí Señor[.] T.E. III, págs. 24–25, 112–113 y 82.

El tribunal concluyó, a base de las propias declaraciones vertidas por el testigo, que su declaración era libre y voluntaria. No debe pasarse por alto que el juicio contra los ape-

lantes se celebró *cinco (5) meses* después de Juan Delgado De Jesús haber confesado extrajudicialmente y que no existe evidencia de que durante ese período se le hubiera amenazado o coaccionado. Por el contrario, el testigo aseveró que el trato que le brindó el fiscal Meléndez y el sargento Cortés había sido bueno. T.E. II, pág. 100; T.E. VI, pág. 380.

*El efecto de la confesión extrajudicial en la judicial*

Ahora bien, evaluaremos el planteamiento de los apelantes en el sentido de que el testimonio prestado en corte por el testigo Juan Delgado De Jesús estaba igual de viciado que la confesión extrajudicial prestada y que por ello no podía considerarse el mismo como voluntario.

El análisis de los apelantes se funda en que cualquier declaración posterior a una obtenida ilegalmente es "fruto del árbol prohibido" y, por lo tanto, es inadmisible en el juicio contra los acusados. No les asiste la razón.

■■■ La inadmisibilidad de una confesión de culpabilidad por razón de la ilegalidad de las circunstancias bajo las cuales se obtuvo no impide la obtención de una subsiguiente *cuando las circunstancias de ilegalidad han dejado de existir.* United States v. Bayer, 331 U.S. 532 (1947); *Bram v. United States,* 168 U.S. 532 (1897); *Lyons v. Oklahoma,* 322 U.S. 596 (1944); *Leyra v. Denno,* 347 U.S. 556 (1954); *United States v. Matthews,* 488 F. Supp. 374 (D. Neb. 1980); D.M. Nissman, E. Hagen y P.R. Brooks, *Law of Confessions,* Nueva York, Ed. The Lawyers Co-operative Pub. Co., 1985, Cap. 9, Sec. 9:1, págs. 243–247; W.E. Ringel, *Searches and Seizures, Arrests and Confessions,* 2da ed., Nueva York, Ed. Clark Boardman Co., 1985, Vol. 2, Cap. 25, sec. 25.2(g)(2), págs. 25-23–25-25. La afirmación de un testigo durante el juicio de que está declarando libre de coacción y amenaza, sumado al hecho de que ha transcurrido *un término considerable* desde que fue puesto bajo custodia, y de que no fue

maltratado o amenazado en ese lapso de tiempo convierte su testimonio posterior en voluntario. Demostrada la voluntariedad del testimonio posterior, no hay razón para que éste no sea admitido. *People v. Portelli*, 205 N.E.2d 857 (1965); *People v. Bates*, 324 N.E.2d 88 (1975); *U.S. ex rel. Blackwell v. Franzen*, 540 F. Supp. 151 (N.D. Ill. 1981).

■ Contrario a lo que afirman los apelantes, se puede admitir una confesión con posterioridad a una obtenida ilegalmente siempre y cuando se demuestre que, considerada la totalidad de las circunstancias, se ha roto la cadena de eventos de tal forma que la segunda confesión es voluntaria y libre de los defectos de la primera. *United States v. Bayer*, supra; *Lyons v. Oklahoma*, supra; *Darwin v. Connecticut*, 391 U.S. 346, 349 (1968); *Clewis v. Texas*, 386 U.S. 707 (1967); *Betts v. Brady*, 316 U.S. 455 (1942); *Lisenba v. California*, 314 U.S. 219 (1941).

■ Este Tribunal también ha sostenido que para determinar si una segunda confesión es voluntaria o secuela de la coacción de la primera debemos evaluar el tipo de coacción utilizada que vició la primera confesión, si ésta se ha prolongado y si ha producido igual vicio en la segunda, o si por el contrario la coacción inicial desapareció al momento de prestarse la segunda confesión. Si el efecto de la coacción que produjo la primera confesión se ha disipado previo a que el acusado haga la segunda, la confesión es voluntaria por razón de que el acusado readquirió su libertad mental para confesar o negar su participación en el crimen. *Pueblo v. Fournier*, 80 D.P.R. 390 (1958); *Pueblo v. Fournier*, 77 D.P.R. 222 (1954).

Los apelantes citan el caso *Bradford v. Johnson*, 354 F. Supp. 1331 (E.D. Mich. 1972), como el que debe gobernar la situación de autos. Dicho caso no tiene el alcance que los apelantes le atribuyen en referencia al contexto fáctico de autos.

En *Bradford v. Johnson*, supra, quien confesó incriminando a Bradford había sido sometido a *torturas y amenazas durante las veinticuatro (24) horas previas* a prestar su confesión y durante los *dos (2)* o *tres (3) días* siguientes a la confesión. En dicho caso el tribunal concluyó que el testigo que previamente había confesado al declarar en el juicio *continuaba bajo la presión* de los agentes que precisamente lo habían obligado a confesar, por tanto su confesión en juicio era fruto de la coerción policíaca y secuela de la primera confesión involuntaria. La situación fáctica del caso de autos es totalmente distinta a la de *Bradford v. Johnson*, supra.

*Como ya señaláramos, la convicción de los apelantes no se obtuvo a base de una confesión extrajudicial, pues ésta, aunque voluntaria, ni siquiera se utilizó en el juicio. La convicción se logró a base del testimonio prestado en corte abierta por Juan Delgado De Jesús y la otra prueba de cargo.* Dicho testimonio fue de carácter voluntario y libre de toda coacción física y emocional, según expresado por el propio Juan Delgado De Jesús en corte abierta. T.E. III, págs. 24–25, 82 y 112; T.E. IV, pág. 34. No existe tampoco prueba alguna que establezca que el testigo fuera amenazado durante el juicio para que declarara contra los aquí apelantes o que estuviera en una condición de continua coacción.

*Defensas del coacusado*

Como parte de las alegaciones de los apelantes, se nos plantea la cuestión de si un coacusado tiene la capacidad legal para levantar en su defensa la alegada violación de derechos constitucionales sufridos por un tercero, máxime cuando la violación a los derechos de ese tercero pudiera tener efectos sobre los propios derechos de los coacusados.

▮ La norma vigente es que un coacusado carece de la capacidad legal para levantar como defensa la violación de los derechos constitucionales sufrida por terceras personas.

*Alderman v. United States*, 394 U.S. 165 (1967); *United States v. Dowdy*, 486 F.2d 1042 (5to Cir. 1973); *United States v. Colyer*, 571 F.2d 941 (5to Cir. 1978); *United States v. Fredericks*, 586 F.2d 478 (1978); *United States v. Mayes*, 512 F.2d 637 (6to Cir. 1975); *LaFrance v. Bohlinges*, 499 F.2d 29 (1er Cir. 1974); *Stein v. New York*, 346 U.S. 156 (1953). Sin embargo, la violación a un acusado de sus derechos protegidos por la Quinta Enmienda puede alcanzar tal nivel que el efecto concreto sobre el coacusado implicado sea el de privarle de su derecho a un juicio justo e imparcial. *United States v. Chiavola*, 744 F.2d 1271 (7mo Cir. 1984); *United States ex rel. Cunningham v. DeRobertis*, 719 F.2d 892 (7mo Cir. 1983); *Bradford v. Johnson*, supra. Dentro de ese contexto es que se le ha reconocido al coacusado el derecho a objetar el que se admitan en juicio las declaraciones extraídas a otro coacusado mediante coacción. *United States v. Merkt*, 764 F.2d 266, 273–274 (5to Cir. 1985); *United States v. Fredericks*, supra, pág. 481; *United States ex rel. Cunningham v. DeRobertis*, supra, págs. 895–896; *LaFrance v. Bohlinges*, supra; *Bradford v. Johnson*, supra. Ello ocurre cuando el Ministerio Público intenta utilizar en el juicio la confesión obtenida mediante fuerza física. *United States v. Merkt*, supra; *United States ex rel. Cunningham v. DeRobertis*, supra; *United States v. Chiavola*, supra; *United States v. Fredericks*, supra.

Aunque en *United States ex rel. Cunningham v. DeRobertis*, supra, hubo una determinación previa sobre la voluntariedad de la confesión extrajudicial del coacusado, el tribunal indicó que bajo el supuesto de que la confesión hubiera sido involuntaria, al no ser ésta presentada en juicio, no se afectaban los derechos constitucionales del coacusado implicado, pues la confesión únicamente había sido útil durante los procedimientos investigativos del crimen.

En el caso de autos no existe controversia alguna en cuanto al hecho de que la confesión extrajudicial de Juan

Delgado De Jesús no fue utilizada en el juicio. Por lo que aun bajo el supuesto esgrimido por los apelantes de que la misma fuera involuntaria, tendríamos que concluir que no se le afectaron los derechos de los apelantes, pues la confesión extrajudicial de Juan Delgado De Jesús únicamente fue útil durante las etapas investigativas e iniciales del caso.

*La inmunidad concedida*

Un elemento que debemos considerar al evaluar el testimonio De Juan Delgado De Jesús es la solicitud que éste hiciera de inmunidad total y la concesión de la misma hecha por el Ministerio Fiscal. La solicitud de inmunidad total del testigo Juan Delgado De Jesús, como condición para continuar declarando siendo él un coacusado, constituyó un ejercicio válido de su derecho a no incriminarse. Art. II, Sec. 11 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1. Por otra parte, el ofrecimiento de inmunidad total que le hiciere el Ministerio Público a cambio de su testimonio no constituyó un acto de coacción sino, por el contrario, un acto legítimo. Regla 24 de Evidencia, 32 L.P.R.A. Ap. IV; *Batalla v. Tribunal de Distrito*, 74 D.P.R. 289 (1953). En ese sentido, señalamos que:

> "Un estatuto de inmunidad, no es equivalente a una amnistía para el crimen. No está predicado en un sentido de magnanimidad hacia los criminales, ni designado para borrar los delitos. Tampoco para ser usado como una trampa por el gobierno. Su único propósito es facilitar la administración de la justicia criminal, haciendo asequible evidencia necesaria, imposible de conseguir sin la inmunidad." *Batalla v. Tribunal de Distrito*, supra, pág. 309.

El Jurado, al momento de evaluar el testimonio del testigo, tuvo ante su consideración el hecho de que el testigo era un coautor de los actos delictivos, que el fiscal había llegado a unos acuerdos iniciales con ese testigo a cambio de su declaración y que durante el juicio hubo que darle inmunidad total

a cambio de su testimonio. Todos estos factores pesaron en el ánimo de los juzgadores al momento de evaluar su testimonio. T.E. XIV, págs. 49–50. El propio tribunal, al impartirle las instrucciones al Jurado, le señaló específicamente que debía examinar con cautela el testimonio prestado por Juan Delgado De Jesús y darle el peso y la credibilidad que correspondiera a la luz de la prueba presentada en el caso, máxime cuando dicho testimonio pudo haber estado fundado en una promesa de inmunidad. T.E. XIV, pág. 49. En vista de estos factores, no intervendremos con la apreciación del Jurado. *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748 (1985); *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984); *Pueblo v. Rosario Cintrón*, 102 D.P.R. 82 (1974).

### III

Pasamos a discutir el segundo y el tercer error alegados por el apelante Martín Ramos.

*La confesión extrajudicial de Martín Ramos*

De acuerdo con el apelante Ramos, el tribunal de instancia erró al admitir en evidencia una confesión extrajudicial del *propio apelante*, ya que la misma no había sido voluntaria. Examinada la prueba presentada, concluimos que la renuncia de Martín Ramos a su derecho a no incriminarse fue expresa e inteligente.

El apelante prestó dos (2) declaraciones, una verbal y otra por escrito. Argumentó que la declaración verbal la ofreció al sargento Cortés y que, al momento de prestar esa primera declaración, hizo un reclamo a su derecho a no incriminarse, el cual no le fue respetado.

Surge de los autos que en el momento en que el sargento Cortés se dispuso a interrogar al apelante en relación con los robos al banco, le leyó las advertencias legales detenidamente y le preguntó si las entendía. T.E. V, pág. 299. El sar-

gento le informó que si deseaba hacer alguna llamada la podía hacer. Íd. El apelante le indicó al sargento Cortés que quería comunicarse con su mamá. A pesar de que el agente realizó varias llamadas, no consiguió comunicarse con la madre del apelante. Posteriormente, el apelante le indicó que iba a declarar sobre su participación en los asaltos y procedió a prestar su confesión. Íd. Durante todo ese período de tiempo, el apelante evidenció un estado de ánimo tranquilo y adecuado.

Citamos directamente de la transcripción:

FISCAL : ¿Le pregunto, si usted tiene la oportunidad de observar a Martín Ramos Delgado allí frente a usted, en el momento en que le estaba haciendo las advertencias?

TESTIGO
[Sargento Cortés]: Correcto, estábamos a corta distancia.

FISCAL : ¿Según su apreciación, cómo era el estado de ánimo de esa persona?

TESTIGO
[Sargento Cortés]: Estaba tranquilo.

FISCAL : ¿Le pregunto, si frente a usted esta persona le hizo alguna petición o se quejó de algo referente a su persona?

TESTIGO
[Sargento Cortés]: No, no se quejó de nada. En ningún momento manifestó tener algún dolor, físicamente se encontraba bien[.]

.   .   .   .   .   .   .

FISCAL : ¿Cuál fue su impresión si el Sr. Martín Ramos Delgado había entendido las advertencias que usted le leía y cu[á]l era su estado de ánimo?

TESTIGO
[Sargento Cortés]: [É]l entendió muy bien y su estado de ánimo era perfecto.

.   .   .   .   .   .   .

FISCAL : Una vez que usted le relató las advertencias, ¿qué sucedió luego de eso?

TESTIGO

[Sargento Cortés]: Entonces procedí a hacerle ciertas preguntas.

FISCAL : En relación a la última pregunta de si desea usted declarar, ¿cuál fue la contestación del Sr. Martín Ramos Delgado?

TESTIGO

[Sargento Cortés]: [É]l me dijo que s[í], que [é]l iba a decir lo que había ocurrido y la participación de él en los dos casos.

. . . . . . . . .

FISCAL : Usted dice que el Sr. Martín Ramos Delgado deseó declarar, o sea, contestar a la pregunta de la advertencia, que deseaba declarar.

TESTIGO

[Sargento Cortés]: Correcto. T.E. V, págs. 297–300.

El apelante, entonces, fue llevado ante el fiscal Soto, quien le tomó una declaración escrita luego de haberle hecho las advertencias legales. T.E. V, págs. 307–325 y 346. No hay ningún indicio de que durante el interrogatorio realizado por el sargento Cortés y el fiscal Soto se le hubiera sometido a coacción física o psicológica. T.E. V, págs. 296–297.

Ante el reclamo de Martín Ramos de comunicarse con su madre, él tenía la opción de declarar o de negarse a hacerlo hasta tanto lograra comunicarse con ella. El apelante escogió declarar. De hecho, su señora madre fue testigo de su confesión escrita.

■ El apelante también sostiene que su confesión fue involuntaria por el hecho de que el agente le informó que otros coautores ya habían confesado.

■ El hecho de que el agente policíaco le informara al apelante Martín Ramos que otro de los coautores había confesado, no afectó la voluntariedad de la confesión del apelante. Durante el curso de una investigación los agentes

pueden confrontar a un sospechoso con aquella información que se posea en contra de ellos. La confrontación con dicha información, por sí sola, no convierte en involuntaria la subsiguiente confesión del apelante. *Williams v. State of Ohio*, 547 F.2d 40 (6to Cir. 1976); *State v. Chamberlain*, 297 S.E.2d 540 (1982); *State v. Booker*, 293 S.E.2d 78 (1982); *State v. Mitchell*, 144 S.E.2d 646 (1965).

## Las advertencias legales

En términos de las advertencias que el sargento Cortés le hizo a Martín Ramos, las mismas fueron adecuadas y cumplen con las normas expuestas en *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Pueblo v. López Rodríguez*, 118 D.P.R. 515 (1987); T.E. V, págs. 297 y 331–332. En particular, el agente atestó que le leyó las advertencias legales directamente de una tarjeta y que, cada vez que las leía, le preguntaba al apelante si las había entendido. T.E. V, pág. 299.

El apelante es una persona normal y no se presentó prueba en términos de que no tuviera la capacidad suficiente para entender las advertencias que se le hicieron, así como de las consecuencias de su admisión. *Pueblo v. Alcalá Fernández*, supra; *Oregón v. Elstad*, 470 U.S. 298 (1985).

Finalmente, Martín Ramos argumenta que su confesión ante el Fiscal era inadmisible por razón de que éste no le advirtió que el Estado le proveería un abogado en caso de que él no pudiera pagarlo.

Si bien es cierto que el fiscal Soto no le hizo la mencionada advertencia al apelante en forma verbal, el sargento Cortés le había indicado al Fiscal que ya le había ofrecido al acusado todas las advertencias legales y que en la declaración jurada firmada por el apelante aparecían consignadas las advertencias legales completas. T.E. V, págs. 325 y 345–346. Por otro lado, desde que el sargento Cortés le hizo todas

las advertencias legales al apelante hasta que éste prestó su declaración ante el fiscal Soto, había transcurrido un término de cuatro (4) horas. No podemos concluir que la confesión del apelante en este caso fuera el resultado de un desconocimiento de sus derechos constitucionales.

## La identificación extrajudicial

El cuarto error alegado por el apelante Martín Ramos es el relativo a la forma en que se llevó a cabo el proceso de identificación extrajudicial y la falta de confiabilidad del mismo. Ante el tribunal de instancia el apelante presentó una moción de supresión de identificación, donde alegaba que no se había observado lo dispuesto en la Regla 252.1(b)(1) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, y que la identificación no era confiable.

El Estado puede valerse de varias formas para identificar a los sospechosos relacionados con el delito investigado. Entre ellas están la identificación mediante rueda de detenidos, fotografías y huellas dactilares. Así también, existen métodos alternos de identificación, entre los que pueden mencionarse las muestras de sangre y la voz. Todos estos métodos, por su tangencia con algunos derechos constitucio-

---

(1) Regla 252.1(b):

". . . *Asistencia de abogado.* Si al momento de celebrarse la rueda de detenidos (*lineup*) ya se hubiese radicado denuncia o acusación contra la persona que motiva el procedimiento, ésta tendrá derecho a que su abogado se encuentre presente mientras se efectúa la misma y a esos efectos se le advertirá con suficiente antelación a la celebración de la rueda.

"La persona podrá renunciar a su derecho a asistencia legal durante la rueda de detenidos mediante una renuncia escrita ante dos (2) testigos quienes también deberán firmar dicha renuncia.

"En caso de que al sospechoso le interesase que su abogado se encontrase presente y así lo manifestara, se notificará al abogado que éste señale con razonable anticipación a la celebración de la rueda. De tratarse de una persona insolvente o si su abogado no compareciese, se le proveerá asistencia legal al efecto." 34 L.P.R.A. Ap. II.

nales tales como el de asistencia de abogado, el de no incriminarse y el de que no se viole el debido proceso de ley, han sido objeto de reglamentación estatutaria y jurisprudencial. D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño,* 2da ed., Hato Rey, Ed. Instituto para el Desarrollo del Derecho, 1980, págs. 25–26; *Pueblo v. Rodríguez Maysonet,* 119 D.P.R. 302 (1987).

Al evaluar el proceso de identificación de acusados, somos conscientes de que éste constituye una etapa importante del procedimiento criminal. Por ello, la admisión de prueba viciada sobre la identificación del acusado puede constituir una violación del debido proceso de ley. *Pueblo v. Rodríguez Maysonet,* supra.

En *United States v. Wade,* 388 U.S. 218 (1967), se estableció el derecho que gozan los acusados, bajo la Constitución de Estados Unidos, a ser asistidos por abogado durante la celebración de una rueda de detenidos. *Pueblo v. Gómez Incera,* 97 D.P.R. 249 (1969). No obstante, en *Kirby v. Illinois,* 406 U.S. 682 (1973), dicho Tribunal limitó el derecho a asistencia de abogado durante la celebración de las ruedas de detenidos al momento en que ya se hubiera presentado una denuncia o acusación.

Nuestra Regla 252.1 de Procedimiento Criminal, *supra,* establece el derecho a asistencia de abogado en la rueda de detenidos siempre que se haya presentado la acusación o denuncia. *Pueblo v. Peterson Pietersz,* 107 D.P.R. 172 (1978).

Para determinar si la admisión de una prueba de identificación viola o no el debido proceso de ley, se debe examinar la "totalidad de las circunstancias" que rodean la identificación. *Pueblo v. Rodríguez Maysonet,* supra; *Pueblo v. Gómez Incera,* supra; *Pueblo v. Peterson Pietersz,* supra;

*Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980); *Pueblo v. Rivera Navarro*, 113 D.P.R. 642 (1982). No se viola el debido proceso de ley si están presentes elementos de confiabilidad tales como: (1) la oportunidad de observación que tuvo el testigo; (2) el grado de atención que prestó durante los sucesos; (3) la fidelidad de la descripción y los detalles que ofreció al ser investigado; (4) el nivel de certeza que demostró cuando identificó al sospechoso, y (5) el tiempo transcurrido entre la comisión del crimen y la confrontación posterior con el sospechoso. *Pueblo v. Peterson Pietersz*, supra; *Pueblo v. Gómez Incera*, supra; *Neil v. Biggers*, 409 U.S. 188 (1972); *Manson v. Brathwide*, 432 U.S. 98 (1977). Lo importante no es el método utilizado en la identificación, sino que la misma sea libre, espontánea y confiable. *Pueblo v. Rosso Vázquez*, 105 D.P.R. 905 (1977).

En *Pueblo v. Gómez Incera*, supra, sostuvimos la convicción del apelante descansando en la confiabilidad de la identificación del acusado, vista a la luz de la totalidad de las circunstancias, conforme dicha norma fuera enunciada en *Stovall v. Denno*, 388 U.S. 293 (1967). Allí señalamos:

> En estas circunstancias estamos convencidos que las dos testigos tuvieron amplia oportunidad de observar al apelante para poder luego identificarlo sin temor alguno de que pudiera ocurrir un extravío de la justicia. Por más de veinte minutos estuvieron observándolo en pleno día, y habiendo ocurrido la primera identificación a sólo dos días de ocurridos los hechos no puede haber temor a una equivocación. *Pueblo v. Gómez Incera*, supra, pág. 259.

La jurisprudencia también ha sostenido que una identificación judicial puede ser válida aun cuando el acusado haya sido señalado durante la etapa crítica del caso, siempre que exista una *"fuente independiente"* para la identificación judicial. *Pueblo v. Rey Marrero*, supra; *United States v. Wade*, supra; *Wong Sun v. United States*, 371 U.S. 471 (1963); *Gilbert v. State of California*, 388 U.S. 1263 (1967).

El tribunal debe examinar si el testimonio de identificación en corte descansó en un fundamento independiente no maculado por el procedimiento de identificación impropio o si la admisión de aquella evidencia fue un error no perjudicial. *People v. Bustamante*, 634 P.2d 927, 936–937 (Cal. 1981); *Hatcher v. State*, 414 N.E.2d 561 (1981).

En el caso de autos, el apelante fue sometido a varias ruedas de detenidos durante el transcurso de 4 de agosto de 1983 (tres (3) semanas después del arresto) y fue identificado positivamente por los testigos Luis Santini y Luis Santiago. De la secuencia cronológica de los hechos resulta que en el momento en que se celebró la rueda de detenidos ya se había presentado denuncia contra el apelante. Conforme a las disposiciones de la Regla 252.1(b) de Procedimiento Criminal, *supra*, el apelante tenía en ese momento derecho a estar asistido de abogado. El tribunal de instancia tuvo ante sí el planteamiento de que Martín Ramos no había estado asistido por abogado durante la celebración de las ruedas de detenidos, pero lo declaró sin lugar.

Un análisis cuidadoso de los hechos de autos nos llevan a concluir que, examinada la totalidad de las circunstancias, el apelante Martín Ramos no se vio afectado por no haber estado asistido de abogado durante la rueda de detenidos. Además, aquí están presentes aquellas circunstancias que garantizan la realización de una identificación independiente y, por ende, confiable y admisible en juicio. *Pueblo v. Peterson Pietersz*, supra, págs. 172–173.

Surge de los autos que el Gerente del Royal Bank of Canada, señor Santini, no confrontó ninguna dificultad en identificar al apelante Martín Ramos en la rueda de detenidos. T.E. V, pág. 242; T.E. VII–B, págs. 9-11. Tampoco la tuvo cuando se celebró el juicio donde identificó a Martín Ramos como el asaltante sin ningún problema. T.E. V, págs. 233, 237 y 242. La identificación extrajudicial del apelante fue realizada treinta y ocho (38) días después del asalto de 27 de junio

al Royal Bank of Canada, lo cual no constituye un término de tiempo excesivo para borrar el recuerdo en una persona con las características del testigo. T.E. V, págs. 233–237, 242, 259 y 265; T.E. VII–B, págs. 9–11. Durante el juicio, el Gerente del Royal Bank of Canada atestó que tuvo una oportunidad adecuada de observar al apelante a plena luz del día y que debido a la naturaleza de su labor —como gerente de una sucursal bancaria— pudo prestarle al asaltante un grado de atención considerable.

El Gerente describió al apelante como de unos 5′6″ ó 5′8″ pies y de pelo oscuro tipo *curly*. T.E. V, pág. 231. Aun cuando en el asalto de 4 de mayo no pudo apreciar su rostro con claridad, pues el apelante se tapaba la cara con un papel, sí lo pudo observar claramente durante el asalto de 27 de junio de 1983. T.E. V, pág. 235. Ese día el señor Santini se encontraba en el estacionamiento del banco cuando observó a los dos (2) asaltantes que salían del banco. Íd. El Gerente pudo ver a Martín Ramos a unos 4 ó 5 pies de distancia y apreciarle el rostro de frente. T.E. V, pág. 265. Particularmente, el apelante en ese momento no tenía cubierto su rostro. T.E. V, pág. 236.

El señor Santini siguió observando a Martín a medida que éste se alejaba del banco, puesto que su interés en todo momento estuvo centrado en poderlo identificar. T.E. V, págs. 235–236.

Aun cuando concluyéramos que la identificación extrajudicial prestada por el testigo Luis Santini era inadmisible, ello no anula la identificación realizada por él durante la celebración del juicio. *Pueblo v. Rey Marrero*, supra, pág. 747; *Pueblo v. Sánchez Álvarez*, 113 D.P.R. 550 (1982). La identificación hecha por el señor Santini se ajusta al análisis de los elementos de confiabilidad expuestos en *Pueblo v. Peterson Pietersz*, supra. El tribunal de instancia contó con la fuente independiente que dio fundamento a una correcta identifica-

ción judicial. En el caso de autos, por tanto, se cumple con la doctrina expuesta en *Pueblo v. Rey Marrero*, supra.

Por su parte, Luis Santiago también identificó a Martín Ramos como el asaltante del banco Royal Bank of Canada. T.E. IV–A, pág. 172. Aun cuando el Sr. Luis Santiago no pudo identificar al acusado en dos (2) de las ruedas de detenidos, sí lo hizo en una tercera rueda y luego durante el juicio. T.E. IV–A, págs. 177, 179 y 203. El testigo indicó que Martín Ramos tenía pelo tipo *curly* y que se había quitado un papel que le cubría la cara (el cual se le caía continuamente) cuando cogió el bulto con el dinero durante el asalto. T.E. IV–A, págs. 174 y 176; T.E. V, pág. 229; T.E. II, pág. 6.

Como sostuviéramos en *Pueblo v. Sánchez Álvarez*, supra, la circunstancia de que algunos de los testigos no hubieran podido identificar al acusado en la rueda de detenidos *no vicia fatalmente la identificación hecha por ellos después en corte abierta.*

El Jurado aquilató el testimonio del gerente Santini y del señor Santiago y le dio entero crédito a los mismos. No vemos razón para revocar dicha apreciación.

## V

El último error planteado por el apelante José Javier Álvarez consiste en que la prueba que tuvo ante sí el Jurado no era suficiente para lograr su convicción. Por tal razón sostiene que no se rebatió la presunción de inocencia y que no se estableció su culpabilidad más allá de duda razonable.

En todo procedimiento criminal, la culpabilidad del acusado debe ser probada más allá de duda razonable. *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974); *Pueblo v. Rivera Arroyo*, 100 D.P.R. 46 (1971). Además, la presunción de inocencia, precepto de índole constitucional, exige que toda convicción siempre esté sostenida por prueba

que establezca más allá de duda razonable todos los elementos del delito y la conexión del acusado con los mismos. Art. II, Sec. 11 de la Carta de Derechos, *supra*; *Pueblo v. Bigio Pastrana*, supra; *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Pueblo v. Picó Vidal*, 99 D.P.R. 708 (1971).

Para sostener su planteamiento, el apelante José Javier Álvarez sostiene que el principal testigo de cargo incurrió en contradicciones y que su declaración estuvo motivada por interés. Alega el señor Álvarez que el testigo Juan Delgado De Jesús declaró a cambio de una sentencia baja y, posteriormente, de inmunidad total. En *Batalla v. Tribunal de Distrito*, supra, pág. 309, expresamos la norma de que los estatutos de inmunidad no son equivalentes a una amnistía para el crimen ni están designados para borrar los delitos. Por ello, no puede concluirse que declaró únicamente movido por la concesión de inmunidad.

█  El hecho de que al coacusado Juan Delgado De Jesús se le otorgase inmunidad, no lo inhabilitaba como testigo. De hecho, la inmunidad concedida podía ser utilizada como fundamento para impugnar su credibilidad. *Davis v. Alaska*, 415 U.S. 308 (1974).

## VI

Por último, el apelante José Javier Álvarez sostiene que las contradicciones en que incurrió el principal testigo de cargo levantan dudas sobre la veracidad de lo declarado por éste. De acuerdo con el apelante, las contradicciones son las siguientes:

(a) El Estado presentó en evidencia una confesión del coacusado Martín Ramos y, en la misma, éste no implicó al apelante José Javier Álvarez como coautor de los tres (3) asaltos. El alegado conflicto no resulta perjudicial a José Javier Álvarez, puesto que el juez de instancia instruyó al Jurado en el sentido de que la confesión de Martín Ramos

únicamente podía ser considerada contra éste. T.E. XII, pág. 33.

(b) Martín Ramos admitió que era él quien planificaba los asaltos y repartía luego el dinero, frente a la versión del testigo de que los robos eran planificados por José Javier Álvarez.

(c) En su confesión, Martín Ramos dio una versión en cuanto al modus operandi en los asaltos, mientras que el coacusado Juan Delgado De Jesús dio otra versión.

(d) El testigo Juan Delgado De Jesús declaró que luego de los asaltos se reunían en la casa de Wanda Ramos y allí repartían el dinero. Esta actividad de repartición se extendía hasta después de las 5:00 P.M., mientras que el testigo de defensa Juan R. Ayala, fundándose en información contenida en unas hojas de asistencia, declaró que en las fechas en que ocurrieron los asaltos el apelante entró a trabajar a las 4:00 P.M.

Un examen cuidadoso de todo el testimonio vertido por el testigo Juan Delgado De Jesús y por el coacusado Martín Ramos nos convence de que no se cometió el error alegado. Es norma reiterada que el hecho de que existan contradicciones en las declaraciones de un testigo, eso de por sí solo, no justifica que se rechace dicha declaración en su totalidad si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable. *Pueblo v. Orellano Gómez*, 92 D.P.R. 546 (1965). No debe resolverse un caso por aquellos detalles que no van a la misma médula de la controversia. *Pueblo v. Espinet Pagán*, 112 D.P.R. 531 (1982).

El hecho de que Martín Ramos no involucrara en los asaltos al apelante José Javier Álvarez, no desvirtúa lo declarado por Juan Delgado De Jesús en el sentido de que José

Javier Álvarez era el autor intelectual de los asaltos. El apelante era novio de la hermana de Martín Ramos, lo cual puede explicar porqué no mencionó al apelante José Javier Álvarez: no involucrar a Wanda Ramos, su novia.

La apreciación de la prueba que hiciera el Jurado fue correcta, por lo que no intervendremos con su apreciación. *Pueblo v. Bigio Pastrana*, supra; *Pueblo v. Cruz Granados*, supra; *Pueblo v. Rosario Cintrón*, supra.

En vista de las razones antes expuestas, *confirmamos las sentencias apeladas.*

Los Jueces Asociados Señores Negrón García, Rebollo López y Hernández Denton concurren con el resultado sin opinión escrita.