*812 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos Eric Barbosa Orona para solicitar que revoquemos una sentencia emitida el 30 de junio de 2008 por el Tribunal de Primera Instancia, Sala de Bayamón (T.P.I.), mediante la cual se le condenó a una pena de cinco y medio (5Vi) años de prisión por la comisión de actos lascivos contra una menor, bajo el Artículo 144-A del Código Penal de Puerto Rico, 33 L.P.R.A. see. 4772.
Por los fundamentos que a continuación expondremos, se confirma la sentencia apelada.
I
Hechos
El apelante Erick Barbosa Orona fue acusado por actos lascivos, Artículo 144a del Código Penal, supra, con relación a hechos ocurridos en Dorado en o para el mes de junio de 2006. Al apelante, quien es vecino de la perjudicada, se le imputó haberle pasado la lengua en la vulva a la menor de 6 años de edad, Melody Cartagena Rivera.
Luego de juicio por tribunal de derecho, el Tribunal encontró culpable al apelante del cargo imputado. El 30 de junio de 2008, mediante la sentencia apelada, el T.P.I. le impuso al apelante una condena de cinco y medio (5 Vi) años de prisión.
La prueba de cargo contra el apelante consistió del testimonio de la perjudicada Melody Cartagena, de su madre Lourdes Rivera y de la agente Lydia Rubert Figueroa.
Surge de la transcripción estipulada de la prueba oral (T.P.0.) que la primera testigo de cargo fue la perjudicada Melody Cartagena, quien para esa fecha ya contaba con 7 años de edad. Melody testificó que cursa el 2do grado en la escuela Ignacio Miranda, que sus notas son A ó B y que reside en la Urb. Jardín Dorado en Dorado, junto a su padre, su madre y sus dos (2) hermanos. La perjudicada identificó al acusado y explicó cómo ella y otros niños jugaban en la calle y dentro de la residencia del acusado, haciendo mención de los juegos que jugaban, entre los que se destaca el por ella denominado como “chess”, que en realidad es ajedrez.
Sobre los hechos imputados, específicamente la perjudicada testificó lo siguiente:
“Fiscal: ¿Y dónde era que iban a jugar chess?
Melody: En la sala.
Fiscal: ¿De la sala de que casa?
Melody: Del de la de Eric.
*813 Fiscal: Bien. Mire ¿y qué pasó, cuénteme qué usted hizo?
Melody: Entramos pa la casa de Eric y entonces él bajó.
Fiscal: ¿Quienes entraron?
Melody: Yo y Eric.
Fiscal: Ok. ¿Y qué pasó?
Melody: Y entonces él bajó el chess.
Fiscal: ¿Dónde estaba el chess?
Melody: En una mesa.
Fiscal: Ajá ¿y lo bajó a dónde?
Melody: En el piso.
Fiscal: En el piso, ¿y qué usted hizo?
Eric: (Inint)------
Melody: Pues entonces nos sentamos.
Fiscal: ¿En dónde se sentaron?
Melody: En el piso.
Fiscal: Ok. ¿Y que pasó?
Melody: Entonces él me cargó, él cargó....
Fiscal: Ok. ¿Él se sentó?
Melody: Umju.
Fiscal: ¿En qué sitio y usted se sentó en qué sitio, por ejemplo?
Melody: Él yo esta sentada aquí y él está sentado alia.
Fiscal: ¿Y el juego de chess dónde estaba?
Melody: En el medio.
Fiscal: En el medio, aja. ¿Y cuéntame qué pasó después?
Melody: Después él me cargó y él se acostó y me echó pa la cara de él.
*814 Fiscal: Ok. Vamos con calma. ¿Él se acostó dónde?
Melody: En el piso.
Fiscal: En el piso. ¿Y cuando usted dice que él la cargó cómo fue, por dónde fue que la cargó?
Melody: Por mmm por la cintura.
Fiscal: Aja. ¿Y cuando él la cargó qué hizo con usted? ¿La agarró por ahí y qué paso?
Melody: Y entonces empezó a...
Fiscal: Ok. ¿Cuándo él la agarró qué hizo?
Melody: Empezó a darme en el pantalón?
Fiscal: Ok. ¿Dónde estaba usted y dónde estaba él? ¿Cómo él pudo hacer eso que usted dice?
Melody: Porque él hizo ah se metió eh estaba el chess en el medio. Él hizo así y me cargó.
Fiscal: ¿Y qué hizo después? ¿Cogió así y qué hizo después, cuál fue el movimiento que él hizo?
Melody: Se acostó en el piso.
Fiscal: ¿Y dónde estaba usted?
Melody: En la cara de él.
Fiscal: En la cara de él. ¿Y dónde estaban las piernas suyas; cómo estaban?
Melody: Eee en el piso.
Fiscal: En el piso. Ok. ¿Y cuándo usted dice que usted estaba sentada en la cara de él qué era lo que le hacía sí le hacía algo?
Melody: Ehhh empezaba a lamberme.
Fiscal: ¿En dónde, en qué parte?
Melody: En la vulva.
Fiscal: En la vulva. ¿Y cómo era eso que él le hacia a usted?
Melody: El me hacía....
Fiscal: Aja. ¿Y eso fue por encima o por debajo del pantalón?
Melody: Por por el pantalón.
Fiscal: Por el pantalón ok. ¿Y qué pantalón usted tenía ese día?
*815 Melody: Un mahón.
Fiscal: ¿Y que camisa tenía si usted se acuerda?
Melody: Creo que tenía una camisa roja.
Fiscal: Una camisa roja. Ok. ¿Y entonces después que él hace eso y usted está como dijo en la cara de él. Qué pasó?
Melody: Y.
Fiscal: ¿Qué pasó? ¿Él está haciendo eso?
Melody: Aja y después baja Jeannie.
Fiscal: ¿Cómo usted sabe eso?
Melody: Porque como se... parece que ella tenía algo unas chancletas o unos tacos y se escuchaban.
Fiscal: ¿Cómo se escuchaban; qué usted escuchó?
Melody: Los zap, los zapatos de ella.
Fiscal: ¿En dónde se escuchaban?
Melody: En la escalera.
Fiscal: En la escalera. ¿Y qué pasó cuando usted Oy.... Escuchó esos zapatos de Jeannie que venía?
Melody: Él me cargó. Él me cargó y me puso de pie.
Fiscal: Aja ¿Y qué hizo él?
Melody: No, él no. Él vino y me cargo y me puso sentá en el chess donde yo estaba.
Fiscal: ¿Dónde estaba al principio?
Melody: Aja y después él se puso allí.
Fiscal: ¿Él se puso dónde?
Melody: En donde estaba.
Fiscal: Ok. Él estaba, ¿usted me había dicho que él estaba acostado?
Melody: Aja.
Fiscal: ¿Y cómo se puso?
Melody: En tu sabe, yo estaba aquí porque él me cargo y me puso así y entonces está el chess en el medio y él *816 estaba en el otro lado.
Fiscal: ' Ok. Mire y entonces ¿Qué qué pasó con Jeannie?
Melody: Jeannie bajó, eh se creyó que estábamos jurando (sic) chess...
Fiscal: ¿Por qué ella se....?
¿Por qué usted cree que ella se creyó eso?
Melody: Pol Porque ella creía que nosotros estábamos jugando chess.
Fiscal: Ok. ¿Y qué pasó después de eso.
Melody: Después él dijo “vente vamos pa arriba Melody”..
Fiscal: ¿A qué?
Melody: A jugar chess. Entonces subimos.
Fiscal: ¿Y usted sabe pa dónde cogió Jeannie?
Melody: Yo creo yo creo que cogió para la cocina.
Fiscal: Ok. ¿Cuándo él, y cuándo él le dijo a usted “vamos pa arriba a jugar chess”, que hicieron si algo?
Melody: Eh subimos arriba y..
Fiscal: ¿Para dónde arriba?
Melody: Para el cuarto de él.
Fiscal: Para el cuarto de él. ¿Y qué pasó con el juego de chess (inint)------?
Melody: Él lo subió.
Fiscal: Él lo subió. Ok. ¿Y dónde lo puso, si en algún sitio?
Melody: En la cama.
Fiscal: En la cama. ¿Y qué, qué hizo usted, dónde estaba usted cuando él puso el juego en la cama?
Melody: Ammmmeehh yo creo que yo yo me senté...
Fiscal: ¿En dónde?
Melody: Ee en la cama.
Fiscal: ¿Y don Eric?
*817 Melody: Eh también.
Fiscal: Aja. ¿Y dónde estaba usted y dónde estaba Don Eric y dónde estaba el juego?
Melody: El de yo estaba aquí y él estaba allí y el el juego estaba en el medio.
Fiscal: Aja. ¿Y qué pasó después?
Melody: Después jugamos un ratito.
Fiscal: Umju.
Melody: Y y después él me cargó otra vez por la cintura...
Fiscal: ¿Cómo? Aja.
Melody: Por la cintura y se acostó en la cama y me cogió otra vez.
Fiscal: ¿Y y dónde quedó usted?
Melody: En la cara de él.
Fiscal: En la cara de él. Ok. ¿Y las piernas?
Melody: Enn en la cama.
Fiscal: Ok. ¿Y qué hizo Don Eric si algo cuando usted quedó en la cara de él?
Melody: Ah pues entonces me empezó a lamber...
Fiscal: ¿En dónde?
Melody: En la vulva.
Fiscal: Ok. ¿Y el...
Melody: Y el...
Fiscal: ¿Y la pantalón que usted tenía qué pasó con él?
Melody: Estaba mojado.
Fiscal: ¿Estaba mojado?
Melody: Y y entonces él él me abrió el pantalón...
Fiscal: ¿Cómo abrió pantalón?
Melody: Ehh tenía un bo... yo creo que tenía un botón y me lo abrió y me echó un poquito el pantalón para para abajo.
*818 Fiscal: ¿Hasta dónde?
Melody: Hasta aquí.
Fiscal: Hasta aquí. ¿Y qué pasó; usted tenía.... La ropa interior suya que pasó?
Melody: Me la bajó.
Fiscal: ¿Hasta dónde?
Melody: Hasta aquí.
Fiscal: Aja. ¿Y a todo esto usted estaba en dónde?
Melody: Nn en la cara de él.
Fiscal: En la cara de él. ¿Y qué paso después que le bajó el pantalón y el panty y usted estaba en la cara de él?
Melody: Me empezó a lamer.
Fiscal: Aja. ¿Cómo?
Melody: Así.
Fiscal: Ok. Y entonces, ¿Usted dijo que le que la lambía dónde?
Melody: En la vulva.
Fiscal: Ok. ¿Y qué usted sentía cuando él le hacía eso, si algo?
Melody: Estaba mojado. Mo...
Fiscal: ¿Dónde estaba mojado?
Melody: En la vul, en la vulva mía.
Fiscal: ¿Con qué?
Melody: De babia.
Fiscal: Ok. De babia. Ok. Entonces, ¿Eso pasó cuánto tiempo, si usted sabe?
Melody: No me recuerdo muy bien?
Fiscal: Ok ¿y después que él hizo qué paso?
Melody: Mmmmmmmmm....
Fiscal: ¿Qué usted hizo, si algo?
*819 Melody: Yo yo le dije “voy pal baño”... y después...
Fiscal: ¿A quién usted le dijo eso?
Melody: AAAA, a él.
Fiscal: ¿Por qué?
Melody: Porque me quería ir.
Fiscal: Sí. Ok. ¿Y usted dijo eso y qué pasó después?
Melody: Después me fui corriendo, bajé las escaleras y me fui para mi casa.
Fiscal: ¿Y cuando llegó a su casa qué usted hizo?
Melody: Mami estaba estudiando de un examen de la Universidad que tenía. Y entonces yo le pregunté ¿mami puedo ir a bañarme? y ella me dijo sí, que sí.
Fiscal: ¿Y por qué usted se quería bañar joven?
Melody: Porque tenía el panty mojado.
Fiscal: Ok. ¿Y qué usted hizo con esa ropa interior, con ese panty?
Melody: Lo puse en la ropa sucia.” (T.P.O., págs. 9-14.)
La perjudicada fue contrainterrogada, manteniendo su narración de los hechos y llorando en varias ocasiones. La perjudicada mantuvo su versión de los hechos aún cuando se le hicieron preguntas sugestivas y en contravención a su testimonio, como por ejemplo:
“Borges: ¿Entonces tú dices que Eric pone el juego en el piso y tú te sientas a un lado del juego y él a otro, eso fue lo que tú dijiste, verdad?
Melody: Sí.
Borges: ¿Tú recuerdas que tú nunca dijiste eso en la vista anterior, en la que se estaba grabando, que tú nunca dijiste que Eric pusiera el juego en el piso?
Melody: Yo lo dije.
Borges: Yo te pregunto ¿si lo cierto es que en esa ocasión tú nunca dijiste que jugaran chess en la sala?
Melody: Es que no jugamos chess. Por lo menos que yo me recuerda que que no jugamos chess.
Borges: ¿Se jugaba en la sala, en ma marquesina o en calle, verdad que si?
Melody: En la calle no jugaba, o en la acera.
Borges: ¿Y tú dices que momento tu le dices a Eric que vas para el baño, pero Eric en ningún momento te dijo *820 “ve a ese baño que está ahí que ahí (ININT)-------
Melody: No, no él no me dijo nada.
Borges: De hecho según tu testimonio prácticamente Eric no habló.
Melody: No, no dijo nada.
Borges: ¿Teniéndote él encima de él en la cara...?
¿Es que entonces te baja el pantalón con el panty?
Melody: No, él me puso primero y después, me abrió el pantalón y me jaló un poquito y el panty también.
Borges: ¿Y el juego nunca se viró de chess co las piezas?
Melody: Sí, se viró.
También en el contrainterrogatorio expresó su sentir durante los hechos:
Borges: ¿Y por qué tú te querías ir según tu testimonio después que le dijiste que querías ir para el baño, por qué tú te querías Melody?
Melody: Porque yo me quería ir; me quería bañar.
Borges: ¿Y por qué no te fuiste cuando estabas en la sala?
Melody: Porque tenía miedo.
Borges: ¿Pero lo cierto es que tú le tienes miedo a Eric?
Melody: Sí.”
Luego testificó la Sra. Lourdes Rivera y narró cómo la perjudicada le contó lo sucedido una tarde en el vehículo familiar estando estacionado en el estacionamiento de Burger King. El testimonio narrado fue el siguiente:
“...Nos quedamos las niñas y yo en el carro. De momento ella comienza a llorar a llorar. Yo le pregunto que porqué, ella no me quería decir porque decía que yo le iba a-dar, pero como te voy a dar si no se lo que me vas a decir. Sigue llorando con un llanto que tenía un dolor aquí en el cuello que me tenía que decir algo, pero que no se atrevía. Yo le digo “mamita, pero tú no confías en mí, dime que es lo que pasa”. Ahí me dice que Eric le había lambió como ella dice, sus partes privadas. Le preguntó que dónde, y me dice que en su casa, le pregunto que día fue, ella dice que no recuerda que día fue en específico.” (T.P.O., pág. 46.)
Además, la Sra Rivera testificó que Melody comenzó a orinarse encima luego de ocurridos los hechos y que también comenzó a tener pesadillas aproximadamente 2 veces por semana. En esas pesadillas, el apelante entra a la casa de la perjudicada y le tira piedras a las ventanas. Narró que ahora, la menor duerme en el cuarto de su madre y algunas veces con su hermana.
La tercera y última testigo de cargo fue la agente Lydia Rubert adscrita a la División de Delitos Sexuales y *821 Maltrato de Menores del Distrito de Bayamón. Rubert testificó que, como parte de su investigación, entrevistó a la Sra. Lourdes Rivera y a la perjudicada. Testificó sobre lo que Melody le narró.
“Lydia: Este que cuando ella entró a la sala, cuando iban a jugar chess, pues, no jugaron chess, porque, Eric le empezó a quitar el botón del pantalón, que ella se ponía la mano, para que no se la quitara y Eric, lo que hizo fue que le pasó la lengua por encima del pantalón en su área del frente.
Fiscal: Bien, ¿y eso Melody le dice que eso ocurre en qué lugar de la casa?
Lydia: En la parte de abajo, en la sala.
Fiscal: Aja, continúe.
Lydia: Que cuando se escucha un ruido, que está bajando como unas chancletas....
Fiscal: Uhum.
Lydia: Que el señor lo deja de hacer, y le dice a Melody, que, fuéramos para arriba para la parte de arriba.
Fiscal: Yo le pregunto ¿si Melody le dijo, para qué fue que él le invitó que fuera para arriba?
Lydia: Él le dijo que se llevara el chess, a jugar.
Fiscal: Ok, ¿y qué pasó luego de eso, según Melody?
Lydia: Se llevó el chess para arriba lo pusieron en la cama, y vino Don, el Sr. Eric....
Fiscal: Uhum.
Lydia: Y que Eric le empezó a quitar el pan, el botón del pantalón, le bajó el pantalón, el panty, que la pone frente de él, y entonces con las manos le abre, la vulva, y empieza a lamberle mucho rato, que ella le dijo que se estaba orinando, pero que no era verdad, era para ella poderse ir, que ella bajó, se fue un ratito al trampolín y entonces se fue a su casa, que cuando ella llega a su casa, su mamá estaba leyendo un libro, en el cuarto y le pidió permiso para bañarse, yo le pregunté a ella que por qué ella se iba a bañar ella me dijo porque se sentía mojada, y que quería botar el panty.
Fiscal: Yo le pregunto ¿si Melody, le dijo, con qué era que ella estaba mojada?
Lydia: Porque la la había lambido ahí.” (T.P.O., págs. 64-66.)
Como parte del contrainterrogatorio, la agente Rubert admitió que no entrevistó a las hermanas de la perjudicada que se encontraban en el vehículo cuando ésta expresa por primera vez lo ocurrido, así como tampoco a su padre. También expresó que el caso no fue llevado ante la consideración de un perito para validar la versión de la perjudicada, ni ésta fue sometida a evaluación psicológica alguna. Tampoco se realizó estudio social, ni se realizó un referido al Departamento de la Familia, porque el padre reside en la casa y la madre es protectora de la menor.
La prueba de la defensa consistió en el testimonio de la Sra. Virginia Hernández, maestra en la Escuela Superior de Dorado y pareja consensual por 22 años del apelante. En esencia, Hernández testificó de cómo es su relación con algunos vecinos de la urbanización, incluidos los padres de la perjudicada. Además, narró un *822 comentario que hizo Melody sobre su gatita y explicó cómo es la parte de debajo de su casa, mostrando una fotografía que consta en el expediente. En el contrainterrogatorio, surgió que ella no estuvo presente en los hechos que se alegan, aunque sí estaba en la casa. (T.P.O., pág. 86.)
A base de la prueba desfilada, el tribunal declaró al apelante culpable del delito imputado y le impuso la sentencia mencionada.
Insatisfecho, el apelante acudió ante este Tribunal. Con el beneficio de la comparecencia de la Oficina del Procurador General y, luego de examinar la totalidad de la prueba, así como los autos originales, procedemos a resolver conforme a derecho.
n
Derecho Aplicable
A
El Artículo 144 del Código Penal, supra, que tipifica el delito de actos lascivos dispone que:
“Toda persona que, sin intentar consumar el delito de agresión sexual descrito en el (sic) la see. 4770 de este título, someta a otra persona a un acto que tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del imputado, en cualquiera de las circunstancias que se exponen a continuación incurrirá en delito grave de tercer grado:
(a) Si la víctima al momento del hecho es menor de dieciséis (16) años.
[-]■”
En cuanto al delito de actos lascivos, la profesora Dora Nevares-Muñiz en su obra Nuevo Código Penal de Puerto Rico Comentado, comenta lo siguiente:
“Los elementos del delito son someter sin su consentimiento, o con su consentimiento jurídicamente invalido (sic), a un acto que tienda a despertar, excitar o satisfacer la pasión o deseos sexuales sin intención de cometer una penetración sexual, en cualquiera de las modalidades que especifica el artículo. [...]
Un acto lascivo o impúdico es aquél que tiende a despertar, excitar o satisfacer la impudicia, pasión o deseos sexuales. Los actos realizados por el sujeto activo deben tender a satisfacer el impulso sexual en el acusado o producir en la víctima un placer camal, que al mismo tiempo lesiona su honor o intimidad sexual. Se trata de una ofensa al pudor e indemnidad sexual de la víctima realizada sin ánimo de acceso camal. Puede consistir en un contacto con el cuerpo, aunque no se halle desnudo, de la víctima, o en obligar e inducir a ésta a realizar actos sobre la persona del imputado para excitar o satisfacer sus deseos sexuales.
[...]
En los casos de las víctimas que tienen protección del ordenamiento jurídico por razón de su inmadurez mental, fuera por razón de tener menos de dieciséis años o por defecto o incapacidad mental, o por su relación familiar con el acusado, el Estado no requiere que se emplee fuerza física ni que la persona no consienta al acto. Se trata de sujetos pasivos que el Estado tiene que proteger del abuso sexual o de actos impúdicos realizados por personas con el pleno dominio de sus facultades y capacidades físicas. [...].” Id., Instituto para el Desarrollo del Derecho, Inc., 2005, págs. 192-193.
*823 B
La presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado de delito, el cual está consagrado en el Artículo II, Sección 11, de nuestra Constitución y por la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110. Para controvertir la presunción de inocencia que le asiste a un encausado se le exige al Ministerio Público, por disposición constitucional, un quantum de prueba más allá de duda razonable. Ello requiere que el Estado presente prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de éste. Pueblo v. Santiago Collazo, 176 D.P.R. _(2009), 2009 J.T.S. 104, a la pág. 960; 150 D.P.R. 84, 99 (2000); Pueblo en interés del menor F.S.C., 128 D.P.R. 831, 941-942(1991).
Se ha establecido que el quántum de evidencia que la Constitución prevé para que se pueda sostener una convicción es aquel que establece una certeza moral capaz de convencer sobre la concurrencia de todos y cada uno de los elementos del delito o falta imputada, así como la conexión del imputado con éstos. Pueblo v. Irizarry, 156 D.P.R. 780, 787 (2002); Pueblo v. Colón Castillo, 140 D.P.R. 564, 581-582 (1996); Pueblo v. González Román, 138 D.P.R. 691, 708 (1995).
Por otro lado, es horma conocida que la función revisora de este Tribunal en los casos criminales consiste en evaluar si la culpabilidad del acusado fue probada más allá de duda razonable y si se probaron los elementos del delito. Para ello, es importante analizar la prueba presentada y determinar si la misma fue satisfactoria y suficiente. Al evaluar la suficiencia de la evidencia debemos determinar y asegurar de que cualquier manera en que se interprete la veracidad de la prueba presentada, existe una prueba que derrota la presunción de inocencia del acusado y establezca los elementos del delito y la conexión del acusado con éstos. Pueblo v. Colón Castillo, supra, a la pág. 581; Pueblo v. Ramos y Álvarez, 122 D.P.R. 287, 315-316 (1988); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985).
El Tribunal Supremo ha expuesto que la duda razonable que opera en función de nuestro ordenamiento procesal criminal no es una duda especulativa ni imaginable, ni cualquier duda posible. Por el contrario, es aquella duda fundada que surge como producto del raciocinio de todos los elementos de juicio envueltos en un caso. Es decir, existe duda razonable cuando el juzgador queda insatisfecho con la prueba presentada. Pueblo v. Bigio Pastrana, supra; Pueblo v. Cruz Granados, 116 D.P.R. 3 (1984). De este modo, para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación. Pueblo v. Santiago Collazo, supra, a la pág. 961; Pueblo v. Irizarry, supra, a la pág. 788.
Sabido es que, tanto en causas criminales como en civiles, es norma reiterada que las determinaciones de hechos y la adjudicación de credibilidad que hace un tribunal de instancia o un jurado, son merecedoras de gran deferencia por parte de los tribunales apelativos. Un tribunal apelativo, de ordinario, no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha hecho el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. In re: Ruiz Rivera, 168 D.P.R. 246, 253 (2006); Álvarez v. Rivera, 165 D.P.R. 1, 25 (2005); López v. Dr. Cañizares, 163 D.P.R. 119, 136 (2004); Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 62-63 (1991). Sólo ante la presencia de estos elementos o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, es que un foro apelativo debe intervenir con la apreciación efectuada. Pueblo v. Acevedo Estrada, supra, a las págs. 98-99.
Expuesto lo anterior, debemos tener presente que es norma también reiterada, que la determinación de culpabilidad que hace el juzgador de los hechos a nivel de primera instancia, es merecedora de gran deferencia por parte de un foro apelativo. El fundamento o base de mayor peso en que se apoya esta norma, es que dicho juzgador es el que, de ordinario, está en mejor posición para aquilatar la prueba testifical, ya que fue el que escuchó y vio declarar los testigos. Pueblo v. Irizarry, supra; Pueblo v. Maisonave Rodríguez, supra, a las págs. *824 62-63.
ni
Exposición y Análisis
Para fundamentar su error, el apelante argumenta que la prueba desfilada durante el juicio demostró que las circunstancias que rodearon los supuestos hechos hacían poco probable su ocurrencia y que no existió ni un sólo hecho que tendiera a corroborar las alegaciones de la menor. Aduce que el comportamiento de la menor y sus expresiones en corte reflejan ciertos desórdenes de comportamiento que arrojan dudas sobre la veracidad de su relato. Sostiene, además, que no hubo otra queja sobre conducta impropia de clase alguna por parte de los demás vecinos, por lo que las alegaciones en el presente caso son aisladas y únicas. En síntesis, sostiene que todo ello, produjo duda razonable y fundada sobre la culpabilidad del acusado.
Por su parte, el Procurador General alega que el testimonio de la víctima vertido en el juicio establece la responsabilidad del acusado-apelante por el delito de actos lascivos. Sostiene que el testimonio creído como lo fue por el Tribunal constituye prueba suficiente en derecho para establecer la culpabilidad del acusado. Señala, además, que el testimonio de la menor fue corroborado de manera significativa por el de su madre Lourdes Rivera Montañez y por el de la agente Lydia Rubert Figueroa, los cuales le imprimen credibilidad al de la menor.
Según el testimonio de Melody, antes citado, surge que la menor estableció claramente la identidad del acusado, explicó cómo ella y otros niños jugaban en la calle y dentro de la residencia del acusado, haciendo mención de los juegos que jugaban, entre ellos destacó “chess”. Específicamente, narró en detalle lo ocurrido en la casa del acusado el día de los hechos al indicar en qué parte de la sala se sentaron y la posición exacta en la que estaban ubicados en el piso con relación al juego de “chess”. Así también narró la forma en que el acusado la agarró por la cintura y le tocó los pantalones hasta lograr colocarla en una posición encima de su cara para cometer los actos lascivos y cómo, posteriormente, al escuchar que su esposa bajaba las escaleras, la colocó nuevamente en el piso como si estuvieran jugando. La menor también brindó detalles específicos de lo ocurrido cuando subieron al segundo piso de la residencia en términos de que se sentaron en la cama y colocaron el juego de “chess” en medio de los dos, que luego de jugar un rato, la agarró nuevamente por la cintura, la colocó encima de su cara, le abrió el botón del pantalón, le bajó el “panty” y le lamió la vulva. Luego, explicó que para lograr escapar le dijo al acusado que iba para el baño y se fue para su casa. Finalmente describió las condiciones en que quedó su ropa interior y sus genitales luego de la comisión del acto lascivo, hasta llegar a su casa y pedirle permiso a su madre para bañarse.
La señora Rivera Montañez corroboró el testimonio de la menor Melody en cuanto a que el día de los hechos se encontraba estudiando cuando su hija llegó a la casa y le pidió permiso para bañarse. (T.P.O., pág. 50). También corroboró la versión de la menor en cuanto a que la primera vez que ésta le contó lo ocurrido en casa del acusado fue en el estacionamiento de Burker King mientras ambas se encontraban dentro del auto esperando por su esposo y padre de la menor, quien estaba comprando comida. (T.P.O., pág. 46). Asimismo, dicha testigo corroboró, en los aspectos más importantes, el testimonio de su hija de cómo sucedieron los hechos. (T.P.O., págs. 51-52).
A su vez, la agente Rubert, por medio de su testimonio, corroboró lo atestiguado, tanto por la menor como por su madre, mediante las entrevistas realizadas a éstas por separado. De su testimonio surge que la menor le relató básicamente la misma secuencia de hechos que le contó a su mamá y que relató en detalle durante el juicio.
El (T.P.I.) se sirvió principalmente de estos tres testimonios para rendir su fallo condenatorio y, eventualmente, dictar sentencia contra el apelante. Damos deferencia al dictamen del (T.P.I.). El T.P.I. hizo un *825 examen concienzudo de las declaraciones en su totalidad y le dio el valor probatorio que le mereció.
Al evaluar las declaraciones que los testigos hacen ante un tribunal, debe tenerse presente que la Regla 10 (D) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(D), establece que “[I]a evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley u otra cosa se disponga.” Si el juzgador entiende que el testimonio de un sólo testigo merece entero crédito en cuanto al hecho que se busca probar, esto será suficiente para dar ese hecho como probado. Pueblo v. Rodríguez Román, 128 D.P.R. 121, 128 (1991).
El hecho de que un testigo incurra en contradicciones o inconsistencias durante su testimonio, no impide que el juzgador le dé crédito al mismo. Pueblo v. Chévere Heredia, 139 D.P.R. 1, 15 (1995); Pueblo v. Pagán, Ortiz, 130 D.P.R. 470, 483 (1992); Pueblo v. Rodríguez Román, supra, a la pág. 129. Nuestro Tribunal Supremo ha reconocido que aun cuando un testigo incurra en contradicciones o inconsistencias, como puede ser cuando se trata de detalles y hechos los cuales la mente puede confundir, el juzgador de los hechos tiene la facultad para resolver el valor que dará a su testimonio al evaluar la totalidad del mismo. Pueblo v. Ramos y Álvarez, 122 D.P.R. 287, 317 (1998).
Los testigos presentados por el Ministerio Público establecieron los detalles para sostener sus respectivas versiones y corroborar la versión de la menor Melody. A pesar de ciertas omisiones en el testimonio de la víctima, el mismo fue objeto de evaluación por el (T.P.I.), a quien le mereció entera credibilidad a los efectos de encontrar al apelante incurso en falta por la infracción al Artículo 144a del Código Penal de 2004. El juzgador tiene la facultad de dar la credibilidad y valor probatorio que entienda adecuado, aun cuando los testimonios de los testigos no sean perfectos. Pueblo v. Ramos Miranda, 140 D.P.R. 547 (1996); Pueblo v. Ramos Delgado, 122 D.P.R. 287 (1998); Pueblo v. Cabán Torres, 117 D.P.R. 645 (1986).
En resumen, nada hemos hallado en el expediente que demuestre la existencia de error manifiesto, pasión, prejuicio o parcialidad en la apreciación de la prueba realizada por el foro de instancia que amerite la intervención de este Foro. Al contrario, del expediente se desprende que el T.P.I. realizó un análisis razonable de la totalidad de la prueba presentada y aquilató el valor probatorio de cada testimonio. Después de todo, nadie conoce mejor la embarcación como el experimentado capitán que iza sus velas.
De un ponderado análisis de la transcripción de la prueba, así como de la totalidad del expediente, somos del criterio que los testimonios vertidos por los testigos de cargo fueron suficientes en derecho y demostraron la culpabilidad del Sr. Barbosa Orona más allá de toda duda razonable. Concluimos que la prueba desfilada durante el juicio evidenció todos los elementos del delito imputado.
IV
Dictamen
Por los fundamentos expresados, se confirma la sentencia apelada.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones