ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VII

| El PUEBLO DE PUERTO RICO<br>Apelado<br><br>V.<br><br>MICHAEL LASANTA FIGUEROA<br>Apelante | KLAN202300380 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso criminal núm.: J LE2021G0162-163<br><br>Sobre: Art. 3.1 y 3.3 de Ley 54 |

Panel integrado por su presidenta, la Juez Ortiz Flores, la Juez Brignoni Mártir y el Juez Candelaria Rosa

Ortiz Flores, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de octubre de 2023.

Comparece ante nosotros el Sr. Michael Lasanta Figueroa (Sr. Lasanta; apelante) y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI) el 17 de abril de 2023, notificada en la misma fecha. Mediante dicho dictamen, el TPI le impuso apelante una pena de cárcel de tres años bajo el régimen de sentencia suspendida tras el veredicto de culpabilidad del jurado sobre violaciones a los Arts. 3.1 y 3.3 de la Ley Núm. 54.

Por los fundamentos que expondremos a continuación, confirmamos la *Sentencia* apelada.

**I**

El 21 de marzo de 2021, por hechos ocurridos el 16 de marzo del mismo año, se presentaron ante el TPI dos denuncias contra el Sr. Lasanta por la comisión de los delitos graves de *maltrato* y *maltrato mediante amenaza*, tipificados en los Artículos 3.1 y 3.3 de la *Ley para la Prevención e Intervención con la Violencia Doméstica*, Ley Núm. 54 del 15 de agosto de 1989, 8 LPRA secs. 631 y 633 (Ley 54), respectivamente, y el foro recurrido determinó causa para arresto por ambos delitos contra el apelante.[1]

---

[1] *Denuncias*, Apéndice del *Alegato de la parte apelante*, Anejo III, págs. 15 y 16.

La vista preliminar se celebró el 6 de julio de 2021 y el Tribunal determinó causa para acusar al Sr. Lasanta por los delitos imputados. El 7 de julio de 2023, el Ministerio Público presentó los pliegos acusatorios por ambos delitos, que contienen los siguientes hechos:

**JLE2021G0162**: El referido acusado Michael Lasanta Figueroa, allá en o para el 16 de marzo de 2021, en Guánica Puerto Rico que forma parte de la jurisdicción del Tribunal de Primera Instancia Sala de Ponce, a propósito empleó violencia psicológica contra la señora [ACL] con quien sostiene una relación consensual por 17 años y procrearon dos hijos, consistente en que causó daño emocional a la víctima, este le escribió con lápiz labial en el cristal del gavetero de su cuarto las palabras PUTA, FLEJE Y CUERO. Además, este mantiene un patrón de palabras de menos desprecio, descrédito y decirle que se tiene que marchar de la casa en la cual vive con los hijos de ambos. siendo esto un patrón de conducta.[2]

**JLE20210163**: El referido acusado Michael Lasanta Figueroa, allá en o para el 20 de marzo de 2021, en Guánica, Puerto Rico que forma parte de la jurisdicción del Tribunal de Primera Instancia Sala de Ponce, a propósito, amenazó con causarle daño a la señora [ACL] con quien sostiene una relación consensual por 17 años y procrearon dos hijos, consistente en que le manifestó que prendería en fuego la casa en cual vive ella con sus dos hijos. sintiendo esta temor por su seguridad.[3]

Llamado el caso para el juicio en su fondo, las vistas se llevaron a cabo durante el 28 de marzo, 2 de mayo y 3 de mayo de 2022. Como parte de la prueba, declaró la agente Marilyn Ortiz Bogglio (agente) y la víctima del delito acusado (ACL), testimonios que resumimos según necesario para resolver el recurso ante nuestra consideración. Por un lado, el testimonio de la agente –quien testificó durante la vista del 28 de marzo– consistió en relatar sus hallazgos sobre la investigación de los hechos. En esencia, esta expuso los sucesos que le relató la víctima durante su entrevista sobre lo vivido con el acusado en los días y meses previos a la denuncia. Particularmente, la víctima le mencionó lo acontecido los días, 8, 16 y 20 de marzo de 2021.  La agente declaró que la víctima le mostró mensajes que el acusado le envió el 8 de marzo, entre los cuales se encontraba una "foto de un hoyo que parece un hoyo de cementerio".[4]

---

[2] *Acusación*, Apéndice del *Alegato de la parte apelante*, Anejo V, pág. 19.1.
[3] *Id.*, pág. 20.
[4] *Cont. Transcripción en Vista Celebrada a: Agente Marilyn Ortiz Bogglio* (en adelante, TPO I), vista del 28 de marzo de 2022, pág. 91 (líneas 17-20).

La agente aclaró que, al momento de su intervención, ya la víctima había presentado una querella y había completado una Planilla Informativa.[5] Mediante dicha planilla, la querellante declaró que hacía dos años, tuvo una situación con su pareja, padre de sus hijos, que intentaron ir a terapia, y que le había enviado una foto de un hoyo. Además, que en dicha planilla la víctima relató sobre el día en que llegó a su casa y encontró el espejo de su cuarto escrito con *lipstick*: "PUTA, FLEJE" y otra palabra que no recordó.[6] Asimismo, en la planilla explicó que en una llamada telefónica el Sr. Lasanta le dijo "que le iba a quemar la casa, que se fuera de esa casa, que la casa era de él, que ella estaba viva por los hijos, que no lo probara, como que ella no sabe lo que él sería capaz, esas cosas decía".[7]

Tras haber leído la planilla informativa, inició la entrevista en la cual la víctima le informó que estos habían acordado que el Sr. Lasanta cuidaría de sus hijos en su casa mientras ella iba a trabajar, y que por consiguiente este tenía acceso a la propiedad.[8] Además, le indicó que durante los últimos dos años estos habían tenido problemas y que habían intentado ir a terapia.[9] En cuanto a la foto del hoyo, la víctima le contó que el 8 de marzo el Sr. Lasanta le envió la referida imagen.[10] Así lo comprobó la agente al ver que era el número correspondiente a este. Según esta declaró en el juicio, la agente vio varios mensajes de textos relacionados a esta foto.[11] Conforme surge de la prueba desfilada, luego de enviarle la referida imagen, estos compartieron la siguiente serie de mensajes de texto:

> ACL:
> Q es eso.
>
> LASANTA:
> Lo que te mereces estar en ese bonito lugar.
>
> ACL: En algún momento de mi vida lo pensé pero gracias a mi psicóloga y al amor de mis hijos lo superé y será en el momento que Dios diga. Lindo día.

---

[5] TPO 1, pág. 48 (líneas 4-7).
[6] *Id,* pág. 50 (líneas 13-18).
[7] *Id*, pág. 51(líneas 1-5).
[8] *Id.*, pág. 54 (líneas 13-17).
[9] *Id.*, pág. 55 (líneas 3-17), pág. 56 (líneas 11-16).
[10] *Id.*, pág. 91 (líneas 17-21).
[11] *Id.*, pág. 92 (líneas 1-17).

LASANTA: Allí es donde te mereces estar y que te metan viva y le pongan arriba tierra y cemento. Pero si quieres un pase vip solo pon me aprueba.[12]

Por otro lado, la víctima le mostró desde su celular fotos de las palabras que encontró escritas en su espejo.[13] Le relató que, en la noche del 16 de marzo, salió a comprar comida junto con su hijo menor. Al regresar, vio que en el espejo de su cuarto habían escrito las palabras "puta", "fleje" y otra que la agente no recordó.[14] Además, le indicó que en ocasiones anteriores había encontrado que en sus fotos familiares le habían tapado su cara con cinta adhesiva.[15] Como parte de la prueba, se presentaron las fotos que tomó la víctima a los espejos escritos.[16]

El 20 de marzo, fecha en que ACL fue al cuartel, el Lasanta tenía los menores y le dijo que se los iba a llevar a la casa.[17] Esta le respondió que no, que los dejara con su mamá.[18] Sin embargo, este le respondió que no, que los iba a llevar a la casa.[19] Estos tuvieron una llamada telefónica, en la que Lasanta le dijo que esa era su casa, que recogiera su ropa y se fuera, que no pertenecía allí.[20] Además, ACL le dijo que si se quedaba en la residencia iba a llamar a la policía, pero este le dijo que no tenía miedo, que llamara a la policía.[21] Posteriormente le dijo que la casa era de él y que prefería pegarle fuego, que él podía pegarle fuego por que la casa era suya.[22] Conforme relató la agente, esto fue lo que convenció a la víctima que debía hacer una querella.[23]

La agente declaró que dicha conversación fue grabada por ACL mediante una aplicación de teléfono celular.[24] Aclaró que el volumen de la referida grabación es bajo, que se escucha una discusión de la víctima y una voz en el fondo. Sin embargo, la agente estableció que dicha voz de

---

[12] Exhibit 4 del Ministerio Público.
[13] TPO I, pág. 62 (líneas 8-24) y pág. 63 (líneas 1-4).
[14] *Id.*, en la pág. 83 (líneas 1-11).
[15] *Id.*
[16] Exhibits 2 y 3 del Ministerio Público.
[17] TPO I, pág. 99 (líneas 11-16).
[18] *Id.*, pág. 100 (líneas 3-9).
[19] *Id.*
[20] *Id.*, pág. 101 (líneas 11-22).
[21] *Id.*
[22] *Id.*, pág. 102 (líneas 1-5).
[23] *Id.*
[24] *Id.*, pág. 104 (líneas 8-11).

fondo le dijo a la víctima que le quemaría la casa.[25] Esta precisó que no pudo identificar la persona que se escucha de fondo, a pesar de que acudió a la división de crímenes cibernéticos para que le ayudaran a ampliar la voz.[26] Tras la llamada telefónica, ACL, quien se encontraba en el estacionamiento del cuartel, fue a hacer la querella. Esta fue la última discusión que tuvieron entre estos.[27] En cuanto al elemento de amenaza, la agente declaró que -conforme a su investigación- la víctima se sintió en peligro cuando: (1) le envió la foto del hoyo y le dujo que ahí debía estar y que lo probara; (2) le dijo que le iba a quemar la casa, (3) la manipulaba y le decía que iba para la casa, que llamara la policía si quería.[28]

Posteriormente, la agente le leyó las advertencias de ley al Sr. Lasanta, quien se encontraba en una celda y estaba acompañado por su abogado.[29] Tras el entonces sospechoso conversar con su abogado, decidió mostrarle a la agente unas conversaciones entre el Sr. Lasanta y ACL. Conforme a lo declarado por la agente, estos mensajes de textos fueron conversaciones que estos mantuvieron días antes de la radiación de la querella. Entre lo conversado, la agente vio mensajes como: "hoy voy para tu casa, este, ella tenía fotos, este, íntimas y se las enviaba a él, tu sabes … eh, planificaban salir juntos, planificaban encontrarse, tener relaciones".[30] A preguntas del ministerio público, la agente declaró que esto no afectaba de manera alguna los hechos imputados.[31] La agente corroboró dichos mensajes al preguntarle a la víctima quien le contestó que ella intentó que la relación funcionara y que estaba recibiendo ayuda psicológica.[32] Además, le dijo que tenía miedo que si no hacía eso, este la removería de la casa.[33]

Durante el contrainterrogatorio a la agente, esta reconoció que hubo comunicación entre el acusado y la víctima entre el 16 y 20 de marzo de

---

[25] *Id.*, pág. 106 (líneas 5-13).
[26] *Id.*, en la pág. 108 (líneas 3-9).
[27] *Id.*, en la pág. 116 (líneas 9-13).
[28] *Id.*, en la pág. 136 (líneas 14-24).
[29] *Id.*, en la pág. 117 (líneas 4-9).
[30] *Id.*, en la pág. 125 (líneas 13-16).
[31] *Id.*, en la pág. 125 (línea 22).
[32] *Id.*, pág. 126 (líneas 19-21).
[33] *Id.*, pág. 127 (líneas 12-17).

2021, fecha de los hechos imputados.[34] A preguntas del abogado de defensa, se presentó el exhibit #1 y #2 de la defensa. Esta prueba de la defensa consistió en capturas de la conversación entre Lasanta y la víctima, en la cual esta última le envió dos fotos en ropa interior. El Sr. Lasanta le respondió: "Mira si compraste esas mierdas para aquel cuando venga no me mandes nada de eso por favor".[35] La víctima le respondió: "aiii santooo . . . es para ti . . . bobo. . . Michael . . . Quedate aquí hoy. Pones la guagua adentro para que no se vea. Quiero abrazarte toda la noche".[36] A preguntas de la defensa, la agente estableció que ACL temía por su vida por los hechos acontecidos desde el 8 hasta el 20 de marzo, pero durante esos días la víctima le enviaba fotografías y mensajes de texto.[37]

Durante la vista del 2 de mayo de 2022 se presentó el testimonio de la víctima que consistió en los hechos que vivió con el acusado.[38] Declaró sobre su relación de pareja que culminó en abril de 2019, cuando Lasanta se enteró de su infidelidad durante el 2018.[39] Sin embargo, este regresó a vivir a la casa y continuaron su relación hasta el 2020.[40] Que para el 2015, Lasanta compró una casa de madera en donde vivieron hasta que en el 2018 compraron otra casa.[41] Con respecto a estas propiedades, Lasanta le dijo que ya no podían seguir juntos, y le cuestionó cuándo se iba a ir de la casa.[42]

El 8 de marzo, Lasanta llegó a la casa durante la mañana como de costumbre, la víctima le preparó desayuno y hasta tuvieron intimidad.[43] Sin embargo, luego se fue a su trabajo y allí recibió un mensaje de Lasanta a través de *Whatsapp*.[44] La víctima recibió una imagen de un hoyo y este le dijo que era donde merecía estar.[45] Sin embargo, esta declaró que ese día

---

[34] *Id.*, pág. 146 (línea 21).
[35] Exhibit #2 de defensa.
[36] *Id.*
[37] TPO I, pág. 162 (21-23).
[38] *Cont. Transcripción en vista celebrada a: ACL* (en adelante, TPO II), vista del 2 de mayo de 2022, pág. 6 (línea 1).
[39] *Id.*, pág. 15 (líneas 12-24).
[40] *Id.*, pág. 18 (línea 17) - pág. 20 (línea 19).
[41] *Id.*, pág. 23 (líneas 4-11).
[42] *Id.*, pág. 22 (líneas 5-13).
[43] *Id.*, pág. 30 (líneas 20-23).
[44] *Id.*, pág. 31 (línea 12).
[45] *Id.*, pág. 32 (línea 18) - pág. 33 (línea 1).

lo ignoro porque no sintió miedo porque era la primera vez que le escribía algo así y pensó que lo hizo solo para dañarle el día.[46] Esta explicó que le contestó que en algún momento pensó atentar contra su vida, que merecía estar en el hoyo pero que recibió ayuda psicológica y lo superó.[47] Sostuvo que al momento de declarar lo había superado, que terminaron su relación de pareja.[48] Añadió que hizo muchas cosas de las que se arrepintió, como intentar seducirlo y hacer amarres.[49] Además, que en una ocasión publicó un *meme* en Facebook donde puso "fui su esposa y ahora quiere que sea su chilla".[50] Este le envió un mensaje de texto en el que le dijo estaba viva por los nenes, que estaba en la casa por los nenes, que arreglara su crédito y se comprara una propia.[51] Sin embargo, esta lo ignoró y este la insultó.[52]

Conforme lo declarado, el 16 de marzo de 2021, salió durante la noche a comprar comida y a dejar su hijo mayor con su abuela.[53] Esta explicó que dejó la puerta de al frente de su casa sin seguro por que estaría rápido de vuelta.[54] Al regresar, entró en su cuarto y vio que en el espejo estaba escrito con lápiz labial las palabras "cuero y fleje".[55] Luego en el espejo del baño estaba escrito la palabra "puta".[56] Esta sostuvo que reconoció que fue el Sr. Lasanta porque conoce su manuscrito de tantos años.[57] ACL no creyó que este fuera capaz de hacerle algo así, lo llamó y le dijo que fuera a su casa, que tenían que hablar.[58] Lasanta fue hasta allí y hablaron. Al hablar, este le dijo que el problema de estos terminaba cunado ella se fuera de la casa. Esta le respondió que se iba de la casa cuando un juez la mandara a salir.[59] Lasanta se puso agresivo y le lazó objetos.[60]

---

[46] *Id.*, pág. 33 (líneas 2-5).
[47] *Id.*, pág. 35 (líneas 4-8).
[48] *Id.*, pág. 38 (líneas 12-18).
[49] *Id.*, pág. 39 (líneas 1-13).
[50] *Id.*, pág. 42 (líneas 13-16).
[51] *Id.*, pág. 43 (líneas 14-23).
[52] *Id.*
[53] *Id.*, pág. 51 (líneas 7-15).
[54] *Id.*, pág. 52 (líneas 16-18).
[55] *Id.*, pág. 55 (líneas 1-12).
[56] *Id.*
[57] *Id.*
[58] *Id.*, pág. 56 (15-17).
[59] *Id.*, pág. 59 (18-23).
[60] *Id.*

El 18 de marzo de 2021, se supone que Lasanta cuidara de sus hijos durante el fin de semana. Según declaró la víctima, este le dijo "que él sí se podía quedar con los nenes, pero no para dormir porque los nenes tenían que dormir en su cama y que él no me iba a dar como que chance para yo irme a putear".[61] Durante la noche del 20 de marzo de 2021, este le escribió que le iba a llevar los hijos. Esta le respondió que no estaba en la casa, pero este le dijo que los iba a llevar y se iba a quedar allí.[62] ACL no quería que este fuera a su casa, pero este le respondió que esta casa era suya y que iba cuando quisiera.[63] Estos acordaron encontrarse en un restaurante de comida rápida cerca de su casa. Al llegar allí, la víctima se acercó a este para hablar.[64] Se sentó en el asiento del pasajero, y le dijo que las amenazas y los malos tratos tenían que acabar porque si no iba a tener que buscar una orden de protección.[65] Lasanta comenzó a dar puños en el guía del carro y le dijo que hiciera lo que le diera la gana, que llamara la policía e hiciera lo que fuera a hacer.[66]

La víctima salió en camino al cuartel de la policía que estaba muy cerca. Esta declaró que realmente no quería ir al cuartel y lo llamó para ver si se calmaba.[67] Sin embargo, cuando lo llamó vio que estaba agresivo y grabó la conversación mediante una aplicación de su celular, llamada *Call Apps*.[68] La victima testificó que esta le preguntó qué haría este si un juez le decía que ella se quedaba con la casa.[69] Este le respondió que quemaría la casa.[70] Esta sintió que era el momento de parar con toda esta situación y acudió a la policía.[71] A pesar de que grabó esta llamada, reconoció que la voz de Lasanta no se escucha en todo en momento, pero si se entiende

---

[61] *Id.*, pág. 64 (líneas 17-21).
[62] *Id.*, pág. 67 (líneas 10-15).
[63] *Id.*, pág. 68 (líneas 4-9).
[64] *Id.*, pág. 69 (líneas 19-22).
[65] *Id.*, pág. 72 (líneas 16-20).
[66] *Id.*, pág. 73 (líneas 1-4).
[67] *Id.*, (líneas 13-18).
[68] *Id.*
[69] *Id.*, pág.74 (líneas 21-24).
[70] *Id.*
[71] *Id.*, pág. 78 (líneas 18-19).

cuando le dijo que le iba a quemar la casa.[72] Además, que es necesario escucharlo varias veces y en silencio absoluto.[73]

Concluido el interrogatorio directo de la víctima, la defensa presentó una moción de absolución perentoria. Particularmente adujo que de la referida grabación no se escucha la voz del Sr. Lasanta.[74] Por lo cual sostuvo que había ausencia total de prueba.[75] Además, sostuvo que no hubo patrón de maltrato de parte de Lasanta, sino que fue esta quien incurrió que tal conducta al quebrar la relación e intentar recuperarle.[76] Luego de escuchar la postura de la fiscal, el tribunal reservó su determinación con relación a la solicitud de absolución perentoria.[77]

Durante la vista celebrada el 3 de mayo de 2022, la defensa tuvo la oportunidad de contrainterrogar a la víctima. Entre otras cosas, ACL reconoció que le escribió al apelante para que volviera a la casa, que le pidió que fueran a terapia y fue, que le preparó un amarre y que lo insultó mediante palabras soeces.[78] Además, aceptó que grabó al apelante para enviarle dichas grabaciones a la nueva pareja de este.[79] Incluso, después de vencida la orden de protección esta llegó a ir a la residencia del apelante.[80] Durante el redirecto, declaró que sintió miedo cuando encontró sus espejos escritos.[81]

Posteriormente, las partes tuvieron la oportunidad de presentar informes finales. Además, el tribunal impartió las instrucciones al jurado antes de la deliberación del jurado. El 3 de mayo de 2022, el jurado rindió veredicto de culpabilidad en los dos cargos acusados.[82]

Emitido este veredicto, y antes de señalar fecha para emitir sentencia, el Ministerio Público recordó al tribunal que aún estaba

---

[72] *Id.*, pág. 80 (líneas 9-15).
[73] *Id.,* pág. 81.
[74] *Id.*, pág. 92 (líneas 9-10).
[75] *Id.,* pág. 93 (líneas 23-24).
[76] *Id.*, pág. 94
[77] *Id.*, pág. 104 (líneas 15-19).
[78] *Cont. Transcripción en vista celebrada a: ACL* (en adelante, TPO III), vista del 3 de mayo de 2022, págs. 14, 16, 18, 19.
[79] *Id.*, pág. 34 (línea 9).
[80] *Id.*, pág. 35 (líneas 10-14).
[81] *Id.*, pág. 50 (líneas 12-15).
[82] *Id.*, págs. 150 (línea 24) - 151 (líneas 1-19).

pendiente la solicitud de absolución perentoria.[83] La defensa solicitó que el tribunal arrestara el veredicto del jurado, debido a que la prueba presentada durante el juicio no estableció los elementos de los delitos imputados.[84] Sostuvo que en la grabación no se escuchó la voz del acusado decir "que va a quemar la casa".[85] Argumentó que la prueba de los eventos del 16 y 20 de marzo no configuraron los elementos de los artículos 3.1 y 3.3 de la Ley Núm. 54.[86] El Ministerio Público se opuso, señaló que no se encontraban presentes los criterios para la procedencia de una moción de absolución perentoria.[87] La defensa alegó que hubo ausencia total de prueba, especialmente sobre el patrón de maltrato.[88] De igual forma, sostuvo que no se demostró elemento alguno de amenaza.[89] Así las cosas, el Tribunal declaró sin lugar la solicitud de absolución perentoria[90] y citó al convicto a la vista para dictar sentencia.

Tras varias instancias procesales, incluso dictámenes de este Tribunal de Apelaciones, el Tribunal de Primera Instancia impuso la sentencia recurrida. El Sr. Lasanta fue hallado culpable por incurrir en violencia psicológica contra la víctima (en adelante, ACL), con quien sostuvo una relación consensual por diecisiete (17) años y procreó dos hijos menores, consistente en que le escribió con lápiz labial en el cristal del gavetero de su cuarto las palabras "puta", "fleje" y "cuero". Además, fue convicto por haber amenazado a la perjudicada al manifestarle que prendería en fuego la casa en la cual vive con sus hijos.

Por no estar de acuerdo con el veredicto de culpabilidad emitido por el jurado, e inconforme con la *Sentencia* dictada en su contra, el apelante acude ante nosotros y nos señala la comisión de los siguientes errores:

> **Primer error**: Erró el Tribunal de Primera Instancia al declarar culpable al apelante cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable en violación al

---

[83] *Id.*, pág. 153 (líneas 4-7).
[84] *Id.*, págs. 153 (línea 12) - pág. 156 (línea 10).
[85] *Id.*, pág. 154 (líneas 10-13).
[86] *Id.*, pág. 156 (líneas 1-4).
[87] *Id.*, págs. 156 (línea 12) - 158 (línea 10).
[88] *Id.* en la pág. 158 (línea 19), pág. 159 (línea 2).
[89] *Id.* en la pág. 159 (líneas 20-21).
[90] *Id.* en la pág. 160 (líneas 19-20).

derecho a la presunción de inocencia y al debido proceso de ley.

**Segundo error**: Erró el Tribunal de Primera Instancia al declarar culpable al apelante del delito contemplado en el Art. 3.1 cuando la prueba de cargo no estableció el empleo de fuerza física para causar daño físico a su persona o a bienes apreciados por la parte querellante.

**Tercer error**: Erró el Tribunal de Primera Instancia al declarar culpable al apelante del delito contemplado en el Art. 3.3 de la Ley 54 habiendo ausencia total de prueba sobre el elemento de amenaza dirigida a causar daño.

**Cuarto error**: Erró el Tribunal de Primera Instancia al declarar No Ha Lugar la Moción de Absolución Perentoria por ausencia total de prueba en cuanto a los artículos 3.1 y 3.3 de la Ley 54.

Con el beneficio de la comparecencia de la Oficina del Procurador General de Puerto Rico, procedemos a resolver.

**II**

**A. Estándar de revisión judicial en casos de naturaleza penal**

Es norma establecida, como cuestión de Derecho, que "la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación [debido a que] la apreciación de la prueba desfilada en un juicio es un **asunto combinado de hecho y de [D]erecho**". (Énfasis nuestro.) *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). En materia de Derecho Penal nuestra función revisora consiste en evaluar si se derrotó la presunción de inocencia del acusado y si su culpabilidad fue probada por el Estado **más allá de duda razonable**, luego de haberse presentado "prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este último". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). En *Pueblo v. Irizarry*, *supra*, en las págs. 788-789, el Tribunal Supremo pautó lo siguiente:

> No cabe duda que, en el ejercicio de tan delicada función revisora, no podemos abstraernos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones criminales, siempre nos hemos regido por la norma a los efectos de que **la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos s[o]lo intervendremos con dicha apreciación**

**cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto. […] S[o]lo ante la presencia de estos elementos y/o cuando la apreciación de la prueba no concuerde con la realidad fáctica o [e]sta sea inherentemente imposible o increíble, […] habremos de intervenir con la apreciación efectuada.** (Énfasis nuestro.) *Pueblo v. Irizarry, supra*, que cita a *Pueblo v. Maisonave Rodríguez*, 129 DR 49 (1991) y *Pueblo v. Acevedo Estrada*, 150 DPR 84 (2000).

Así pues, "[h]asta tanto se disponga de un método infalible para averiguar sin lugar a duda dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia." *Pueblo v. Carrasquillo*, 102 DPR 545, 552 (1974). Como ya establecimos, en nuestro ejercicio como tribunal revisor impera la norma de deferencia al juzgador de los hechos. Esto último, responde al hecho de que el juzgador de hechos es quien está en mejor posición de evaluar la prueba presentada y dirimir credibilidad, pues es este quien tuvo la prueba ante sí. *Pueblo v. Maisonave Rodríguez, supra,* págs. 62-63. Por ello, solamente intervendremos con dichas determinaciones cuando surja que el foro de instancia incurrió en **error manifiesto, prejuicio o parcialidad** en el ejercicio de la delicada faena de apreciar la prueba. *Pueblo v. Cabán Torres*, 117 DPR 645, 654 (1986). Es importante señalar que aun en los casos en los que existan "contradicciones en las declaraciones de un testigo, eso de por sí solo, no justifica que se rechace dicha declaración en su totalidad **si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable**". (Énfasis nuestro.) *Pueblo v. Ramos Álvarez*, 122 DPR 287, 317 (1988).

La sección 11 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico[91] establece los derechos fundamentales que le asisten a toda persona acusada de la comisión de un delito. Entre los derechos allí reconocidos está el derecho a gozar de la presunción de inocencia. Para rebatir esta presunción se requiere la presentación de

---

[91] Art. II, Sec. 11, CONST. ELA, LPRA, Tomo 1.

evidencia que establezca la culpabilidad del acusado más allá de duda razonable. El peso de la prueba recae en el Estado, quien deberá presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado.

Por ello, la culpabilidad del acusado **no tiene que probarse con certeza matemática**. Lo que se exige es prueba satisfactoria y suficiente en Derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, 200 DPR 834, 848 (2018).

A su vez, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R.110, viabiliza este mandato constitucional al disponer lo siguiente:

> En todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. Si la duda es entre grados de un delito o entre delitos de distinta gravedad s[o]lo podrá condenársele del grado inferior o delito de menor gravedad.

La "presunción de inocencia" se traduce en que todo acusado se considera "inocente" hasta que el Estado pruebe que es culpable más allá de duda razonable mediante la presentación de prueba suficiente y satisfactoria sobre cada uno los elementos del delito imputado y su comisión por el acusado. El Tribunal Supremo de Puerto Rico caracterizó la presunción de inocencia como "el pilar del sistema penal puertorriqueño del cual surgen derechos corolarios, como la garantía al acusado [de] que no permanecerá detenido preventivamente, en espera del juicio, en exceso de seis meses y el derecho a la libertad bajo fianza". *Pueblo v. Pagán Medina*, 175 DPR 557, 567-568 (2009).

Por ello, la garantía constitucional a la "presunción de inocencia" acompaña al imputado de delito desde el inicio de la acción penal hasta el fallo o veredicto de culpabilidad. E. Chiesa Aponte*, Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Vol. II, Forum, 1992, pág. 111. La prueba requerida al Estado es aquella que produzca "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Irizarry, supra*, en la pág. 787. El Tribunal Supremo describió

dicha prueba como la que establece "'aquella certeza moral que convence, dirige la inteligencia y satisface la razón […]'". *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985) que cita a *Pueblo v. Gagot Mangual*, 96 DPR 625, 627 (1968).

Por último, es importante enfatizar que es al Estado a quien le corresponde presentar la prueba, directa o circunstancial, de todos los elementos del delito y de la conexión del acusado con el mismo. Si el Estado no logra establecer lo anterior, más allá de duda razonable, no procede una convicción, independientemente de la credibilidad que la prueba le haya merecido al juzgador de los hechos. *Pueblo v. Colón, Castillo*, 140 DPR 564, 581 (1996).

### B. Delitos tipificados en los artículos 3.1 y 3,3 de la Ley 54

El Artículo 3.1 de la Ley Núm. 54 tipifica como delito de *maltrato* la siguiente conducta:

> Toda persona que empleare fuerza física o violencia psicológica o económica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya conhabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, para causarle daño físico a su persona, al animal de compañía o mascota de la víctima, de los hijos o del victimario, a los bienes apreciados por esta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional, incurrirá en delito grave de cuarto grado en su mitad superior. No será necesaria la prueba de un patrón de conducta para que se constituya el delito de maltrato. El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida.
> 8 LPRA sec. 631.[92]

Este delito se configura cuando están presentes los siguientes tres elementos. A saber: (1) que se emplee fuerza física, violencia psicológica, persecución o intimidación; (2) que dicha conducta se lleve a cabo contra

---

[92] Este delito fue enmendado para aclarar que: "La violencia psicológica también ocurrirá cuando se utilice cualquier tipo de comunicación electrónica o digital, mediante mensajes de texto, correo de voz, correos electrónicos, o redes sociales, o cualquier otro medio digital, incluyendo sistemas de rastreo digital, que tenga el efecto de acosar, perseguir, intimidar, o afligir a una persona con quien cohabita o haya cohabitado. Para que se constituya la violencia psicológica mediante violencia digital o cibernética, no será necesario la prueba de un patrón de conducta". Ley Núm. 41-2023 Sin embargo, esta disposición no estaba vigente al momento de los hechos imputados.

"la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija", y (3) que se haga para causarle algún daño físico (a la persona o sus bienes, salvo los dispuestos por ley), o grave daño emocional. *Pueblo v. Ayala García*, 186 DPR 196, 213 (2012).

Según ha interpretado nuestro Tribunal Supremo, el delito antes descrito contiene dos modalidades. Entiéndase, maltrato físico, y maltrato emocional. *Pueblo v. Osvaldo Ríos*, 156 DPR 428, 435 (2012). Referente al maltrato físico, el Supremo ha concluido que, en dicha modalidad, no se requiere demostrar un patrón reiterado de violencia para que se configure el mismo. *Pueblo v. Figueroa Santana*, 154 DPR 717, 731 (2001). Sin embargo, la propia Ley específica que la modalidad de violencia psicológica en el Artículo 1.3 se trata de "un patrón de conducta constante ejercitada en deshonra, descrédito o menosprecio al valor personal", entre otros. 8 LPRA sec. 602.[93]

El Art. 3.3 de la Ley Núm. 54, *supra*, tipifica el delito de *Maltrato mediante amenaza*. Particularmente, el estatuto dispone lo siguiente:

> Toda persona que amenazare a su cónyuge, ex cónyuge, a la persona con quien cohabita o con quien haya cohabitado o con quien sostiene o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, con causarle daño determinado a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro, incurrirá en delito grave de cuarto grado en su mitad superior. El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida. 8 LPRA sec. 633.[94]

---

[93] Esta definición fue recientemente enmendada para que establecer que violencia psicológica: "Significa aquella conducta ejercitada en deshonra, descrédito o menosprecio al valor personal, limitación irrazonable al acceso y manejo de los bienes comunes, chantaje, vigilancia, persecución, aislamiento, privación de acceso a alimentación o descanso adecuado, amenazas de privar de la custodia de los hijos o hijas, o destrucción de objetos apreciados por la persona, excepto aquellos que pertenecen privativamente al ofensor". Ley Núm. 41-2023. No obstante, esta nueva definición no estaba vigente al momento de los hechos imputados en este caso.

[94] Recientemente esta disposición fue enmendada para establecer que: "La amenaza también ocurrirá cuando se utilice cualquier tipo de comunicación electrónica o digital, mediante mensajes de texto, correo de voz, correos electrónicos o redes sociales, o cualquier otro medio digital". Ley Núm. 41-2023. Sin embargo, dicha definición no estaba vigente al momento de los hechos imputados en este caso.

El Tribunal Supremo de Puerto Rico expresó en *Pueblo v. Ayala García*, 186 DPR 196, 209 (2012), que el elemento de abuso psicológico está presente en los cinco delitos tipificados en la Ley Núm. 54, *supra*. Los distintos tipos de abusos (el físico, el sexual y el psicológico) "se encuentran intrincados en los casos de violencia doméstica". *Id.*, pág. 210. Sin embargo, por imperativo del principio de la legalidad, la conducta lesiva se dividió en varios delitos para establecer de forma clara y específica la conducta prohibida. *Id.*

En lo pertinente al caso de epígrafe, la referida disposición penal identifica al sujeto activo como "toda persona" y al sujeto pasivo, entre otros, como una persona con quien haya procreado un hijo o hija. *Pueblo v. Ayala García*, *supra*, pág. 211. En relación con el término "amenaza", el Tribunal Supremo de Puerto Rico reconoció que no está definido en la Ley Núm. 54, *supra*, de manera que debe ser utilizado "con su acepción coloquial de dar a entender que se le quiere causar algún mal a alguien". *Id.*, pág. 215, esc. 49. A su vez, el Art. 3.3 de la Ley Núm. 54, *supra*, no requiere un patrón de conducta ni un efecto sobre el ánimo de la víctima. *Id.* El delito de *maltrato mediante amenaza* sólo exige que se haga una amenaza de causar un daño determinado. *Id.*; *Pueblo v. Vélez Rodríguez*, 186 DPR 621, 631 (2012).

En esencia, los elementos de este delito son los siguientes: (1) que una persona amenace a su cónyuge o excónyuge, la persona con quien cohabita o haya cohabitado, la persona con quien haya procreado un(a) hijo(a), independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación; (2) con causarle daño físico a su persona, a los bienes apreciados por esta, excepto los que pertenecen privadamente a la persona ofensora, o a otra persona. 8 LPRA sec. 633.

### C. Absolución perentoria

La Regla 135 de las Reglas de Procedimiento Civil, *supra*, establece la absolución perentoria como la facultad de los tribunales para examinar

la suficiencia de la prueba de cargo, y así determinar la no culpabilidad del acusado. *Pueblo v. Colón, Castillo*, 140 DPR 564, 576 (1996). El fin ulterior de esta disposición es evitar que "*un jurado* condene a un acusado cuando la prueba es insuficiente". *Id.* El Tribunal Supremo definió la prueba suficiente como aquella que expone todos los elementos del delito y que es susceptible de ser creída por una persona razonable. *Pueblo v. Rivera Ortiz*, 150 DPR 457, 462 (2000).

Así, los tribunales hacen el ejercicio de asegurarse que se encuentran presentes los requisitos legales para permitir un veredicto válido. *Id*. en la pág. 463. Esta evaluación que realiza el tribunal es distinta a la adjudicación de credibilidad que compete al jurado. *Pueblo v. Colón, Castillo*, *supra*, en la pág. 578. Su gestión se limita a un examen de existencia y contenido de los elementos del delito, por lo cual el tribunal no valora su peso. *Id.* en la pág. 579. "[E]l tribunal de instancia ha de limitarse a adjudicarse si la prueba es suficiente en derecho para proceder a someterla al Jurado, para que sea éste quien decida sobre el peso que deba dársele". *Id.* en la pág. 580. Por cuanto, se trata de un análisis estrictamente de derecho. *Id.*

**III**

En su escrito de apelación el apelante nos señala como primer error que incidió el foro primario debido a que la prueba de cargo no estableció su culpabilidad más allá de duda razonable. Además, puntualizó que el Tribunal de Primera Instancia erró al declararle culpable por el delito del 3.1 de la Ley Núm. 54 cuando hubo insuficiencia de prueba sobre el empleo de fuerza física. También, respecto a la convicción por el Art. 3.3, señaló que hubo ausencia total de prueba sobre el elemento de amenaza dirigida a causar daño. Finalmente adujo que erró el Tribunal de Primera Instancia al declarar *no ha lugar* su moción de absolución perentoria por ausencia de prueba. Por estos señalamientos de error estar íntimamente relacionados los discutiremos en conjunto.

Conforme recogido en la primera sección, en este caso se celebró juicio por jurado el cual se extendió durante tres días y en el cual declararon dos testigos del Ministerio Público. En primer lugar, la agente Marilyn Ortiz Bogglio prestó testimonio sobre su intervención en la investigación criminal de la querella presentada por ACL Carrillo Lozada. En esencia declaró que entrevistó a la víctima tras la presentación de su querella, en la que indicó que en una ocasión su ex pareja le envió una foto de un hoyo, otro día este le escribió en su espejo: "puta, fleje" y otra palabra que no recordó, y que iba a quemar la casa si esta no se iba.[95] Además, la agente declaró que la entrevistó y pudo corroborar dicha información. Particularmente, esta le dijo que tras su separación estos acordaron que el Sr. Lasanta cuidaría de sus hijos en su casa mientras ella trabajaba.[96] En cuanto a la foto del hoyo, la agente pudo ver el teléfono de la víctima y comprobar que el emisario fue el Sr. Lasanta, puesto que era su número celular. También, vio mensajes relacionados a esta fotografía.

Esta conversación de mensajes de texto fue admitida como el exhibit #4 del Ministerio Publico. De dicha prueba surge que el apelante le dijo a la víctima que merecía estar en ese bonito lugar, que la metieran viva y le pusieran tierra y cemento arriba.[97] Mas aun, le dijo "pero si quieres un pase vip solo pon me aprueba".[98] [sic].

Por otro lado, la agente vio del celular de la víctima varias fotos que esta le tomó a los cristales de su habitación.[99] Esta le relató que salió a comprar comida y al regresar se encontró sus espejos escritos. Dichas fotos se presentaron como prueba del Ministerio Público, de las cuales surge que fueron escritas las siguientes tres palabras: *puta*, *fleje* y *cuero*.[100] La agente también declaró que, según ACL le relató, el 20 de marzo este la amenazó con quemar su casa.[101] Precisamente, le dijo que ese día el

---

[95] TPO I, en las págs 50 (líneas 1-5, 13-18).
[96] *Id.*, en la pág. 54 (líneas 13-17).
[97] Exhibit #4 del Ministerio Público.
[98] *Id.*
[99] TPO I, en las págs. 62 (líneas 8-24), pág. 63 (líneas 1-4).
[100] Exhibits 2 y 3 del Ministerio Público.
[101] TPO I, en la pág. 102 (líneas 1-5).

apelante tenía los menores, pero le dijo que se los iba a llevar a la casa. Debido a que la víctima no estaba allí, este le dijo que iría de todos modos. ACL le dijo que no fuera, que iba a llama a la policía, pero este le dijo que no tenía miedo, y que los llamara. La agente pudo comprobar dicha amenaza al escuchar la grabación que la víctima realizó de la llamada a través de una aplicación en su teléfono celular.[102] Esta declaró que, el volumen de dicha grabación era bajo, pero que se escuchaba una voz de fondo que decía que le quemaría la casa. Sin embargo, esta no pudo identificar la voz de dicha persona, aun cuando acudió a ayuda técnica especializada de la Policía.[103] No obstante, ACL le relató que, tras concluir dicha llamada, presentó la querella que dio origen a este caso. Mas adelante, la agente declaró sobre el elemento de amenaza, cuando ACL le dijo que sintió peligro en tres ocasiones, a saber: con la foto del hoyo cuando le dijo que le quemaría la casa y cuando le dijo que llamara la policía por que a él no le importaba.[104]

La agente tuvo la oportunidad de entrevistar al apelante, quien decidió mostrarle varias conversaciones entre estos días antes a la radicación de la querella. Sin embargo, la testigo sostuvo que este hecho no afectó en manera lo imputado en la querella.[105] Mas aun, la agente pudo cuestionar a la víctima sobre este particular, quien le dijo que se mantuvo en comunicación con el apelante por que intentó que la relación funcionara y que tenía miedo de que éste la removiera de su hogar.

Respecto al testimonio de la víctima, la Sra. ACL declaró que tuvieron una relación de aproximadamente 17 años, pero que culminó cuando el apelante se enteró de su infidelidad.[106] Sin embargo, este regresó a la casa y continuaron su relación hasta el 2020.[107] Sobre los hechos imputados, el 8 de marzo de 2021, esta recibió una imagen de un hoyo por *Whatsapp*. Esta declaró que no sintió miedo por que fue la primera

---

[102] *Id.*, en la pág. 104 (líneas 8-11).
[103] *Id.*, en la pág. 108 (líneas 3-9).
[104] *Id.*, en la pág. 136 (líneas 14-24).
[105] *Id..* en la pág. 125 (línea 22).
[106] TPO II, en la pág. 6.
[107] *Id.*, en las págs. 18, 20 (líneas 17-19).

vez que este le escribió algo así.[108] Sobre este particular, reconoció que hizo muchas cosas de las que se arrepintió, por ejemplo, intentar seducirlo, hacerle amarres y publicar *memes* en *Facebook*.[109]

Sobre lo acontecido el 16 de marzo de 2021, esta relató que al regresar a su casa vio que su espejo estaba escrito con lápiz labial. Precisó que el espejo de su cuarto decía "puta y fleje", y que el del baño decía "puta". Esta hizo constar que identificó que fue el apelante quien escribió dichos insultos por que reconoce su manuscrito.[110] Además, reconoció que sintió miedo cuando encontró los espejos así,[111] pero esta testificó que no creía que este fuera capaz de hacerle algo así, y lo llamó para hablar. Estos hablaron, pero el apelante se puso agresivo y le lanzó objetos. La víctima declaró que se quedó quieta, sin moverse, por que sintió miedo.[112]

Declaró que el 20 de marzo de 2021, este se encontraba con los menores puesto que le correspondía cuidar de ellos durante el fin de semana. Sin embargo, es te le había dicho que no se podía quedar con los menores porque tenían que dormir en su cama y que ella no podía irse a *putear*.[113] Por lo cual, ese día el apelante le escribió que los iba a llevar a la casa, y ACL le respondió que no estaba allí. Este le dijo que los iba a llevar y que se quedaría allí, que esa era su casa y que iba cuando quisiera.[114] Sin embargo, acordaron encontrarse en un restaurante de comida rápida. Allí hablaron, la víctima le dijo que la agresión tenía que terminar porque si no tendría que buscar una orden de protección. Consiguientemente, esta declaró que se puso a dar puños al guía y le dijo que hiciera lo que quisiera, que llamara a la policía.[115]

La víctima salió en dirección al cuartel, pero antes lo llamó por teléfono. Notó que estaba agresivo y comenzó a grabar la conversación mediante una aplicación de su celular.[116] Precisamente, declaró que esta

---

[108] *Id.*, en la pág. 33 (líneas 1-3).
[109] *Id.*, en la pág. 42 (líneas 13-16).
[110] *Id.*, en las págs. 55.
[111] *Id.*, en las págs. 55 (línea 24), 56 (líneas 12-17).
[112] *Id.*, en la pág. 60 (líneas 13-17).
[113] *Id.*, en la pág. 64 (líneas 17-21).
[114] *Id.*, en la pág. 68 (líneas 4-9).
[115] *Id.* en la pág. 73 (líneas 1-4).
[116] *Id.*

le preguntó qué haría si un juez le decía que ella se quedaba con la casa y este le respondió que le quemaría la casa.[117] A pesar de ello, esta testificó que la voz del apelante no se escucha en todo momento, pero que se escuchaba la voz cuando le dijo que le quemaría la casa. Además, estableció que era necesario escucharlo varias ocasiones y en silencio absoluto.

Durante el contrainterrogatorio, esta reconoció que le había escrito al apelante para que volviera a la casa, que le pidió que fueran a terapia juntos, que le preparó un amarre y que lo insultó. También reconoció que le grabó para enviarle dichas grabaciones a su nueva pareja.[118]

Sobre esta prueba desfilada en juicio, testimonial y documental, el jurado rindió veredicto de culpabilidad sobre ambas acusaciones y el tribunal impuso la pena correspondiente. Inconforme, el apelante presentó el recurso ante nuestra consideración en el que sostiene que hubo insuficiencia de prueba para rebatir su presunción de inocencia. Precisamente, sostiene que el Tribunal de Primera Instancia debió declarar su no culpabilidad, conforme a su facultad de absolución perentoria.

En su primer señalamiento de error, el apelante puntualizó que no estableció su culpabilidad más allá de duda razonable. Según lo antes explicado, la determinación del foro primario, particularmente el veredicto del jurado goza de presunción de corrección. Precisamente, la institución del jurado se encontraba en la posición ideal para evaluar, aquilatar y otorgar credibilidad sobre la prueba desfilada. En ausencia de circunstancias extraordinarias que denoten que se incurrió en error, prejuicio o parcialidad, debemos respetar su adjudicación.

En el segundo señalamiento de error, el apelante sostiene que la prueba de cargo no estableció el empleo de fuerza física para causar daño a esta o sus bienes preciados. Conforme a lo previamente explicado, los elementos del delito de *maltrato* dispuestos por el Art. 3.1 son: (1) que se

---

[117] *Id.* en la pág. 74 (líneas 21-24).
[118] TPO III, en las págs. 14, 16, 18, 19 y 34 (línea 9).

emplee fuerza física, violencia psicológica, persecución o intimidación; (2) que dicha conducta se lleve a cabo contra "la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija", y (3) que se haga para causarle algún daño físico (a la persona o sus bienes, salvo los dispuestos por ley), o grave daño emocional. En este caso se acusó al apelante de haber incurrido a propósito en violencia psicológica, y no de la modalidad del delito que consiste en violencia física. Según definido por la propia Ley Núm. 54, violencia psicológica consiste en un patrón de conducta constante ejercitada en deshonra, descrédito o menosprecio al valor personal.[119]

Evaluado el expediente ante nuestra consideración, concluimos que se presentó prueba de cargo suficiente para establecer el delito de *maltrato* en su modalidad de violencia psicológica. Conforme los hechos relatados, la víctima fue sometida en múltiples ocasiones a comportamiento del apelante sobre los cuales el jurado adjudicó credibilidad y concluyó que se configuró el delito. No encontramos razones, y el apelante no nos ubicó en posición, para concluir que el jurado incurriera prejuicio, parcialidad, error manifiesto o que su conclusión fuera irrazonable.

En su tercer señalamiento de error, el apelante aduce que hubo ausencia total de prueba sobre el elemento de amenaza. Los elementos del delito de *amenaza* según el Art. 3.3 son: (1) que una persona amenace a su cónyuge o excónyuge, la persona con quien cohabita o haya cohabitado, la persona con quien haya procreado un(a) hijo(a), independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación; (2) con causarle daño físico a su persona, a los bienes apreciados por esta, excepto los que pertenecen privadamente a la persona ofensora, o a otra persona.

---

[119] Definición vigente al momento de los hechos que dieron lugar a la acusación.

En este caso, se presentó prueba sobre la amenaza del apelante con quemar la casa en la que la víctima residía. Precisamente se presentó una grabación sobre la cual declaró la víctima quien reconoció que no se escuchaba claramente la voz del apelante pero que sí se podía apreciar el momento en que le amenazó. Además, declaró cuáles fueron los hechos que dieron lugar a que esta grabara dicha conversación y los sucesos que transcurrieron posterior a dicha llamada telefónica. Sobre este asunto, el apelante sostiene que hubo ausencia total de prueba, puesto que no se escuchó su voz, por lo cual no hubo amenaza alguna. No le asiste la razón, puesto que el Ministerio Publicó no descansó exclusivamente en dicha grabación si no que la víctima prestó su declaración. Sobre este testimonio el jurado adjudicó credibilidad y concluyó que dicha amenaza ocurrió y por tanto incurrió en el delito acusado. Nótese que la prueba testimonial es igualmente valida a la documental, por lo cual el testimonio de la víctima era suficiente para que el jurado adjudicara su credibilidad. Fueron múltiples instancias en las que la víctima declaró que sintió miedo, así lo comprobó la agente y el jurado creyó.

Respecto al cuarto señalamiento de error, el apelante sostiene que procedía su absolución perentoria porque hubo ausencia total de prueba. Conforme a lo antes esbozado, el foro primario goza de la facultad para declarar no culpable a un acusado cuando la prueba desfilada por el Ministerio Público es insuficiente para condenar a un acusado. Mediante este ejercicio el Tribunal de Primera Instancia no puede pasar juicio sobre la credibilidad de la prueba, si no que su función se limita a evaluar si se presentó prueba sobre los elementos de los delitos acusados. En este caso, se desfiló prueba suficiente sobre los elementos de los delitos de los Arts. 3.1 y 3.3, particularmente sobre: (1) la relación que tuvo el apelante con la víctima, (2) que se empleó fuerza psicológica, (3) que se hizo con el propósito de causarle daño emocional, y (4) que le amenazó con quemarle la casa. Por consiguiente, el Tribunal de Primera Instancia no erró al rechazar su moción de absolución perentoria, puesto que la prueba era

suficiente para someterla al crisol del jurado y que estos adjudicaran credibilidad.

**IV**

Por los fundamentos que anteceden, confirmamos la sentencia apelada.

Notifíquese.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones